[Cite as *Bryant Health Care Ctr., Inc. v. Ohio Dept. of Job & Family Servs.*, 2014-Ohio-92.]

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Bryant Health Care Center, Inc., | : | |
| Appellant-Appellant, | : | |
| | : | No. 13AP-263 |
| v. | : | (C.P.C. No. 06CVF10-14496) |
| Ohio Department of Job and Family Services [Ohio Department of Medicaid], | : | (REGULAR CALENDAR) |
| | : | |
| Appellee-Appellee. | : | |
| | : | |

# D E C I S I O N

## Rendered on January 14, 2014

*Webster & Associates Co., LPA*, and *Geoffrey E. Webster*, for appellant.

*Michael DeWine*, Attorney General, and *Rebecca L. Thomas*, for appellee.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶1} Appellant, Bryant Health Care Center, Inc. ("appellant"), appeals pursuant to R.C. 119.12 from a judgment of the Franklin County Court of Common Pleas affirming an adjudication order issued by appellee, Ohio Department of Medicaid[1] ("the Department"). The order required that appellant repay to the Department a sum

---

[1] In 1999, the 123rd General Assembly provided that the Ohio Department of Human Services (which administered the Medicaid program at the time of many of the events underlying this appeal) would thereafter be known as the Ohio Department of Job and Family Services. See 1999 H.B. No. 470, amending R.C. 5101.01. Effective July 1, 2013, the Medicaid area within the Ohio Department of Job and Family Services became a separate state agency known as the Ohio Department of Medicaid. See R.C. 121.02(T). The parties in this appeal have used the term "the Department" to describe the agency that administered Medicaid during the events of this case both before and after these changes, and we do so as well.

representing Medicaid overpayments made to appellant. We affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶2}    Appellant operates a 93-bed skilled nursing facility in Lawrence County and was a party to an agreement with the Department to provide long-term care services to qualified recipients pursuant to the state's Medical Assistance Program, commonly known as the "Medicaid" program[2]. Under the terms of the agreement, appellant agreed to accept Medicaid payments consistent with applicable state law as full payment for services rendered to Medicaid-eligible care recipients.

{¶3}    Ohio statutes governing the administration of the Medicaid program in Ohio are codified in R.C. Chapter 5111.[3]  R.C. 5111.21 mandates that the Department pay the reasonable costs of services provided to an eligible Medicaid recipient by a nursing facility such as that operated by appellant.  Reasonable costs include the expense of delivering direct care services (such as nursing costs), indirect care costs (such as administrative costs), and capital costs (such as lease or mortgage costs), R.C. 5111.23, 5111.24, and 5111.25.  Workers' compensation ("WC") premiums constitute reasonable costs and are categorized as either direct care costs or indirect care costs depending upon the work performed by the employees on whose behalf the premiums are paid. *See* R.C. 5111.20(G)(1)(e) and 5111.20(I).

{¶4}    Pursuant to R.C. 5111.26, appellant was required to file an annual cost report with the Department within 90 days after the end of each calendar year ("CY") during which appellant participated in the Medicaid program. The statute required providers to prepare the annual cost report in accordance with administrative rules established by the Department, *e.g.*, Ohio Adm.Code 5111-3-3-20.

---

[2] For an extensive discussion of the history and general administration of the Medicaid program in Ohio during the period relevant to this appeal, including nursing home cost reimbursement, *see Drake Ctr., Inc. v. Ohio Dept. of Human Serv.*, 125 Ohio App.3d 678 (10th Dist.1998).

[3] The Medicaid reimbursement statutes and rules have been revised since the time of the events in this case. All references in this decision to sections of the Revised Code and the Ohio Administrative Code are to provisions as in effect during that time.

{¶5}    The Department used a nursing facility's annual cost report in applying a statutory formula to determine a "per resident per day rate" ("per diem rate") payable to providers for the cost of care of Medicaid residents. R.C. 5111.26 and 5111.27. In determining the total per diem rate, the Department was required to consider the facility's "desk-reviewed, actual, allowable, per diem *direct* care costs" for the relevant CY. (Emphasis added.) R.C. 5111.23(B)(1). The Department was also  required to consider the facility's "desk-reviewed, actual, allowable, per diem *indirect* care costs from the calendar year preceding the fiscal year ['FY'][4] in which the rate will be paid," adjusted for inflation. (Emphasis added.) R.C. 5111.24(A)(1).

{¶6}    The Medicaid reimbursement system was prospective in nature in that, in determining a provider's total per diem rate for a particular FY, the Department used the cost report filed by the provider for a prior CY. For example, appellant's CY 1995 cost report was due in March 1996, and the Department used it to set the per diem rate for FY 1997. Similarly, in determining the FY 1996 per diem rates, the Department used the provider's CY 1994 cost report; in determining a provider's FY 1995 per diem rate, the Department used the provider's 1993 CY cost report, and so forth.

{¶7}    In 1995, the Bureau of Workers' Compensation ("BWC") determined that appellant was entitled to a partial refund of WC premiums appellant had paid during CYs 1991 through 1995.    On September 19, 1995, BWC issued appellant a refund of WC premiums for those years, apportioned as follows:

|      |            |
|------|------------|
| 1991 | $ 14,207.74 |
| 1992 | 20,095.77  |
| 1993 | 12,731.53  |
| 1994 | 11,189.98  |
| 1995 | 4,263.56   |

The total amount of the refund was $62,488.58.

{¶8}    As noted above, appellant did not receive the refund of WC premiums for CYs 1991 through 1994 until September 1995—after it had filed its CYs 1991 through 1994 cost reports.  Accordingly, appellant's CYs 1991 through 1994 cost reports reflected the pre-refund amount of WC premiums paid in each of those years, and the Department

---

[4] For Medicaid purposes, a fiscal year runs from July 1 of the prior year through June 30 of the identified fiscal year.  That is, FY 1997 ran from July 1, 1996 through June 30, 1997.

used the pre-refund amount of WC costs in determining the per diem rates paid to appellant for FYs 1993 through 1996. Had appellant's CYs 1991 through 1994 cost reports reflected its WC premiums as adjusted by the amounts ultimately refunded to appellant for those years, appellant's per diem reimbursement rates for FY 1993 through 1996 would have been lower, and appellant would have received less Medicaid reimbursement for care provided in FY 1993 through 1996.

{¶9}    In September 1995, when appellant received the WC premium refund, the calculation of appellant's per diem reimbursement rates for FYs 1992 through 1995 had not been finally calculated and closed. Rather, the rate recalculations and final settlements for the prior FYs were still open in September 1995 when appellant received the partial refund of appellant's 1991 through 1995 WC premiums. The parties do not dispute that the per diem rates for those FYs became final on the following dates:

FY 1992    Final on 10-31-96
FY 1993    Final on 11-12-96
FY 1994    Final on 03-29-96
FY 1995    Final on 12-02-02[5]

{¶10}    On March 31, 1996, appellant filed its cost report for the 1995 CY and referenced the WC refund it had received in September 1995. It did not, however, report any portion of the WC refund as an offset to its 1995 WC costs. Nor did appellant file amended cost reports for CYs 1991 through 1994, or otherwise advise the Department that it had received a WC refund attributable to those prior years, even though the FY 1993 through 1994 per diem reimbursement rates had not been finally closed on the date of the refund nor on the date appellant filed the 1995 cost report.[6] Instead, appellant reported the WC refund on a schedule included in the 1995 cost report that identified the $62,488.58 WC refund as "other revenue" received by appellant in 1995.

{¶11}    Pursuant to R.C. 5111.27(A), the Department conducted a mandatory desk review of appellant's 1995 cost report to determine whether the reported costs were

[5]  The record does not specify the date upon which the per diem rate for FY 1996 became final. However, the hearing examiner noted in his amended report and recommendation that the FY 1996 rate had not been finally settled at the time of his report and neither party has contested that finding.
[6] Although the parties do not dispute that the per diem rates for FY 1994 became final on March 29, 1996, they also do not dispute the finding of the hearing examiner that the final FY 1994 reimbursement rate had *not* been finally adjudicated on the date appellant filed its CY 1995 cost report.

allowable, as well as a desk audit. The desk auditor noted in an August 18, 1998 narrative audit summary that accompanied the desk audit report that:

> [Appellant] did receive a refund from the Bureau of Worker's Compensation, $62,488.58. This was due to various rate changes that were allowed for the period January 1, 1990-through June 30, 1995. However this amount was not recognized as a cost offset but as a revenue in error.

(State's Exhibit 15, Aug. 18, 1998 summary.)

{¶12} Accordingly, the desk auditors determined that appellant's report of the refund as income was "in error." The auditors concluded that the refund should instead have been reported, in its full amount, as an offset to appellant's 1995 WC costs. The proposed offset significantly reduced appellant's 1995 WC costs from approximately $146,300 to approximately $83,600. Before the audit became final, appellant challenged the desk auditor's conclusions relative to the WC refund. The auditors, however, did not change their position.

{¶13} On September 11, 2002, and consistent with the desk audit, the Department issued a final rate recalculation and settlement for FY 1997. It recalculated appellant's 1997 per diem rate based upon appellant's 1995 cost report as audited. Offsetting the full amount of the WC refund against appellant's 1995 WC costs reduced appellant's total 1995 reasonable costs and resulted in the Department finding that its original calculation of the 1997 per diem rate (which ranged from $85.94 to $86.93) had been too high. The Department determined that the per diem rate should have ranged over the course of FY 1997 from $84.00 to $84.95. The Department determined that it had overpaid appellant Medicaid in the amount of $57,375.68 for FY 1997 and ordered appellant to repay that sum.

{¶14} Appellant requested an R.C. Chapter 119 administrative hearing, and the Department designated a hearing examiner to hear the dispute. The hearing took place on September 25, 2003, and the parties agreed to submit the case on stipulated facts, exhibits, and briefs. They stipulated that the case presented a single legal issue: whether the Department acted in conformance with law in determining that the entire WC refund received in 1995 should be used to offset appellant's 1995 WC costs. The parties further

stipulated that, if the Department's legal position were correct, then appellant owed the Department $54,168.03.[7]

{¶15} On March 25, 2004, the hearing examiner issued a report and recommendation to the Director of the Department ("Director"). The hearing examiner agreed with the appellant that the Department could adjust appellant's costs only on a year-by-year basis and that applying the total amount of the 1991-1995 refund against only the 1995 WC costs was inconsistent with the statutory reimbursement scheme and controlling principles of finality. The hearing examiner recommended that the Director recalculate the FY 1997 per diem rate after offsetting only the $4,264 WC refund attributable to CY 1995.

{¶16} On May 6, 2004, the Director ordered the hearing examiner to conduct a second hearing for the presentation of further testimony and documentary evidence and to thereafter prepare a supplemental or amended report and recommendation.

{¶17} The hearing examiner conducted the second hearing on October 26, 2004 and thereafter issued an amended report and recommendation. Consistent with his earlier report, he concluded that offsetting the entire WC refund against CY 1995 costs would "contravene the statutory directive for the calculation of a prospective rate based upon the *actual* costs incurred during the calendar year preceding the fiscal year in which the rate is to be paid * * * [and] circumvent controlling principles of finality." (Emphasis sic.) (June 30, 2005 Amended Report and Recommendation, 17.) That is, he determined that only the 1995-related portion of the WC refund—a total of $4,263.56— could be used to offset appellant's 1995 WC costs. He found the 1991 through 1994 per diem amounts to be final at the time of his report and recommendation and concluded that the Department therefore could no longer recover overpayments it had made to the Department during those closed FYs. (Report and Recommendation, 17.) He observed, however, that the Department might, at the time of his report and recommendation, yet have proposed an adjustment to the CY 1994 costs for the purposes of recalculating the reimbursement rate for FY 1996, as that rate calculation had not yet become final, but "as to those audits that have been adjudicated and closed without any reservation of

---

[7] The parties now agree that this figure may be subject to revision in the course of the Department's recalculation of the 1995 per diem rate if the Department's adjudication order is upheld .

rights, the reimbursement Section cannot simply resort to the alternative of offsetting the portions of the workers' compensation refund allocable to earlier calendar years against the workers' compensation premiums reported by [appellant] on its 1995 cost report."  (Report and Recommendation, 11.)

{¶18}    In finding that the Department was precluded from offsetting the remaining $58,225.02 of the refund against appellant's 1997 WC premium costs, the hearing officer effectively found that approximately 75 percent of the WC refund[8] would not be reflected in the per diem rate of any of the relevant periods, i.e., FYs 1993-1996.

{¶19}    In its October 23, 2006 adjudication order, the Director rejected the hearing officer's reasoning and conclusion concerning the WC premium refund. The Director acknowledged that this court had held in *Ohio Academy of Nursing Homes, Inc. v. Ohio Dept. of Job and Family Servs.,* 194 Ohio App.3d 413, 2002-Ohio-4721 (10th Dist.), that the Department could not unilaterally re-open a settled, closed cost audit period and adjust a provider's rate for that period.  But the Director concluded that the Department's action in offsetting the full amount of the 1995 WC refund against appellant's 1995 WC costs did not constitute an attempt to re-open a closed period. Rather, the Director concluded that the Department was statutorily required to offset the total amount of the WC refund against appellant's 1995 WC costs, including the total amount of the refund, even though that amount included refunds of prior 1991 through 1994 WC premium payments.

{¶20}    Accordingly, the Director ordered the Department to move the entire amount of the WC refund to the WC lines of the salary and wage accounts in appellant's 1995 cost report and notify appellant of the amount of the resulting Medicaid overpayment.   The Director further ordered appellant to repay the resulting 1997 Medicaid overpayment amount that had been calculated on the basis of the pre-audit 1995 cost report.

{¶21}    Appellant then filed an appeal of the Director's adjudication order in the Franklin County Court of Common Pleas pursuant to R.C. Chapter 119. Final determination of that appeal was delayed pending resolution by the Supreme Court of

---

[8] The 75 percent figure results from dividing the WC refund attributable to CYs 1991, 1992, and 1993 ($47,033.00)  by the total amount of the refund ($62,488.58.)

Ohio of issues related to the applicability of *Medcorp, Inc. v. Ohio Dept. of Job and Family Servs.*, 121 Ohio St.3d 622, 2009-Ohio-2058. Ultimately, however, the common pleas court affirmed the Department's adjudication order, finding it to be supported by probative, substantial, and reliable evidence and in accordance with law.

{¶22}   Appellant timely appeals, asserting two assignments of error:

> [1.]  The trial court erred in granting [the Department] far too much deference.
>
> 2.  The trial court erred in finding the Director's adjudication order was supported by reliable, probative and substantial evidence.

## II. ANALYSIS

{¶23}   We first address the standard of review applicable in R.C. Chapter 119 appeals. In an administrative appeal filed pursuant to R.C. 119.12, the trial court must "review[ ] [the] agency's order to determine whether it is supported by reliable, probative, and substantial evidence and is in accordance with law." *Fletcher v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-46, 2012-Ohio-3920, ¶ 8. In reviewing the trial court's order, the court of appeals must apply the following standard:

> In reviewing the trial court's determination that an order is supported by reliable, probative, and substantial evidence, our role is confined to determining whether the court of common pleas abused its discretion. [Citation omitted.] However, *in determining whether an order was in accordance with law, this court's review is plenary*.

(Emphasis added.)  *Id.,* citing *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.,* 63 Ohio St.3d 339, 343 (1992).

{¶24}   Accordingly, in an R.C. Chapter 119 appeal, this court conducts a de novo review of questions of law. *AmCare, Inc. v. Ohio Dept. of Job and Family Serv.,* 161 Ohio App.3d 350, 2005-Ohio-2714 (10th Dist.), ¶ 10. In the case at bar, appellant and the Department have stipulated that the issue between them is a question of law.

{¶25}   We first consider appellant's argument presented in support of its first assignment of error that the Director exceeded her authority in ordering the hearing examiner to take additional evidence in a second administrative hearing.

{¶26}   The record reflects that, on May 6, 2004, after the hearing examiner had issued its first report and recommendation, the Department entered an order directing the hearing examiner to take additional testimony as authorized by R.C. 119.09 and Ohio Adm.Code 5101:6-50-09(C)(1). Appellant contends that the parties had previously agreed that the matter would be submitted for disposition on briefs and exhibits submitted at the first hearing on September 25, 2003. It argues that the stipulation barred the introduction of any additional evidence at a subsequent hearing.

{¶27}   The trial court found that the Director acted within her authority in ordering the procurement of additional evidence, relying on R.C. 119.09, Ohio Adm.Code 5101:6-50-09(C)(1), and *Alternative Residences, Two, Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 04AP-306, 2004-Ohio-6444. In *Alternative Residences*, this court found that parties who had agreed to submit a stipulated question of law to the hearing officer could not bind the hearing officer to their characterization of the legal issue.

{¶28}   R.C. 119.09 provides that an agency may appoint a hearing examiner to conduct the administrative hearing after which the "examiner shall submit to the agency a written report setting forth [his] findings of fact and conclusions of law and a recommendation of the action to be taken by the agency." The statute then specifies that the "agency may order additional testimony to be taken or permit the introduction of further documentary evidence." R.C. 119.09. *See also* Ohio Adm.Code 5101:6-50-09(C)(1). Moreover, that section states that the "recommendation of the referee or examiner may be approved, modified, or disapproved by the agency."

{¶29}   Appellant concedes that the Department has authority to order additional testimony taken after an administrative hearing. But appellant argues that the Department waived that right in this case by stipulating to the evidence at the September 25, 2003 hearing and contends that it should be bound to *only* the stipulated documentary evidence presented at that first evidentiary hearing. We disagree.

{¶30}   We initially observe that the parties did not stipulate that *only* the exhibits accepted by the hearing examiner at the September 25, 2003 hearing would ever be considered in resolving the parties dispute, nor did the Department ever affirmatively waive its right under R.C. 119.09 to thereafter order that the record be supplemented.

Moreover, it is arguable that the parties could not have, by agreement, deprived the Department of those rights. *See Alternative Residences.*

{¶31} The appellant acknowledged in the oral argument of this appeal that it suffered no prejudice by the introduction of additional evidence at the second, October 26, 2004, hearing and, instead, characterized the second hearing as presenting an opportunity for the Department to reargue its position to the hearing examiner. As observed by the trial court, the facts surrounding this dispute are essentially undisputed. Moreover, under R.C. 119.09, the Department could have simply disapproved the hearing examiner's first report and recommendation based on the record before it. The fact that the Department ordered a second hearing, which for the first time included the testimony of witnesses, was specifically authorized by statute.

{¶32} In the absence of prejudice to appellant, and in light of the Department's express statutory authority to order additional evidence following a hearing examiner's report and recommendation, we reject appellant's argument in support of its first assignment of error. The Department did not lack authority to order a second administrative hearing.

{¶33} Appellant additionally argues in support of its first assignment of error that the trial court granted the Department undue deference relative to calculation of appellant's FY 1995 per diem reimbursement rate. It argues that the hearing examiner was better qualified to interpret and apply the controlling statutory authority and that the trial court therefore should have adopted the hearing examiner's reasoning.

{¶34} We are not persuaded by appellant's argument. This court gives "considerable deference to an agency's interpretation of rules that it administers." *Burden v. Ohio Dept. of Job and Family Servs.,* 10th Dist. No. 11AP-832, 2012-Ohio-1552, ¶ 19. " 'When interpreting statutes, courts must give due deference to those interpretations by "an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility." ' " *Shell v. Ohio Veterinary Med. Licensing Bd.*, 105 Ohio St.3d 420, 2005-Ohio-2423, ¶ 34, quoting *Weiss v. Pub. Util. Comm. of Ohio,* 90 Ohio St.3d 15, 17–18, 2000-Ohio-5. Moreover, both parties suggest that "[a]n agency's interpretation of a statute that governs its actions should be given deference so long as the interpretation is not irrational, unreasonable or

inconsistent with the statutory purpose." *Morning View Care Ctr.-Fulton v. Ohio Dept. of Human Servs.,* 148 Ohio App.3d 518, 2002-Ohio-2878 (10th Dist.), ¶ 47-48, citing *Ellis Ctr. For Long Term Care v. DeBuono*, 175 Misc.2d 443, 448, 669 N.Y.S.2d 782 (1998).

{¶35}    It is true that "an administrative agency should accord due deference to a hearing examiner's findings and recommendations, especially where evidentiary conflicts exist." *Bennett v. State Med. Bd. of Ohio*, 10th Dist. No. 10AP-833, 2011-Ohio-3158, ¶ 31.    But in this case no evidentiary conflict existed as the evidence was undisputed.    Moreover, "the standards of review of an administrative order do not change because an agency rejects its hearing examiner's recommendation." *Id.*    Clearly, appellant prefers the hearing examiner's reasoning over that of the Department.    But, as discussed below relative to appellant's second assignment of error, the Department's interpretation of the controlling statutes and rules was neither irrational, unreasonable or inconsistent with the statutory purposes of the reimbursement statutes. Rather, its interpretation was supported by reliable, probative, and substantial evidence and was in accordance with law.    Accordingly, we reject appellant's argument in support of its first assignment of error that the trial court afforded the Director undue deference in rejecting the amended report and recommendation of the hearing examiner.

{¶36}    We therefore overrule appellant's first assignment of error.

{¶37}    In its second assignment of error, appellant challenges the trial court's acceptance of the Department's substantive legal conclusions. Appellant argues that Ohio's regulatory framework does not allow the Department to offset the entire amount of the WC refund against its 1995 premium costs.    It contends that the Department could offset against its CY 1995 WC costs only the portion of the WC refund attributable to CY 1995, i.e., $4,264.    It further asserts that the hearing examiner correctly opined that applying the total amount of the 1991-1995 refund against only the 1995 WC costs would "contravene the statutory directive for the calculation of a prospective rate based upon the *actual* costs incurred during the calendar year preceding the fiscal year in which the rate is to be paid" [and] "circumvent controlling principles of finality."   (Emphasis sic.) (June 3, 2005 Amended Report and Recommendation, 17.)

{¶38}   As a long-term nursing facility, appellant was entitled to be paid a per diem, per patient, reimbursment rate.  In applying the statutory formulas to determine that rate, R.C. 5111.23 (dealing with direct costs) and 5111.24 (dealing with indirect costs) instructed the Department to consider the facility's desk-reviewed*, actual, allowable*, per diem care costs for the CY preceding the FY at issue.

{¶39}   Ohio Adm.Code 5101:3-3-01(A) provided that, to be recognized as allowable, costs must also be reasonable, as set forth in Ohio Adm.Code 5101:3-3(AA)[9]. The rule further provided that:

> Unless otherwise enumerated in Chapter 5101:3-3 of the Administrative Code, allowable costs are also determined in accordance with the following reference material, as currently issued and updated, in the following priority:
>
> (1) Title 42 Code of Federal Regulations (C.F.R.), Chapter IV;
>
> (2) The provider reimbursement manual   ("HCFA Manual 15-1"); or
>
> (3) Generally accepted accounting principles[.]

{¶40}   Both appellant and the Department acknowledge that, pursuant to Ohio Adm.Code 5101:3-3-01(A), actual, allowable costs are to be determined according to the rules set forth in  those three sources.

{¶41}   The parties further acknowledge that state and federal statutes and regulations fail to address the issue of the accounting in cost reports of refunds attributable to prior reporting years.  Both parties have agreed, as did the hearing examiner, that Section 804 of HCFA Manual 15-1 ("Section 804") therefore provides relevant guidance.   Section 804 provides as follows:

> Discounts, allowances, refunds, and rebates are not to be considered a form of income.  Rather, they should be used to reduce the specific costs to which they apply in the accounting period in which the purchase occurs.

---

[9] Ohio Adm.Code 5103:303(AA) defined "reasonable" as meaning "that a cost is an actual cost that is appropriate and helpful to develop and maintain the operation of patient care facilities and activities, including normal standby costs, and that does not exceed what a prudent buyer pays for a given item or services."

Where the purchase occurs in one accounting period and the related allowance or refund is not received until the subsequent period, where possible, an accrual in the initial period should be made of the amount if it is significant, and cost correspondingly reduced. However, if this cannot be readily accomplished, such amounts may be used to reduce comparable expenses in the period in which they are received.

{¶42} Section 804 is contained within HCFA Manual 15-1, also known as the federal Provider Reimbursement Manual, which contains interpretive guidelines for implementing federal Medicare and Medicaid regulations. The manual, originally issued by the Health Care Financing Administration, is maintained by its successor, the Centers for Medicare and Medicaid Services ("CMS"). See http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/index.html (accessed Dec. 27, 2013) (describing CMS manuals as being "used by CMS program components, partners, contractors, and State Survey Agencies to administer CMS programs. It offers day-to-day operating instructions, policies, and procedures based on statutes and regulations, guidelines, models, and directives.)" *See also* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals.html?DLSort=0&DLPage=1&DLSortDir=ascending (specifically referencing the Provider Reimbursement Manual) (accessed on December 27, 2013).

{¶43} Appellant emphasizes the first sentence of Section 804 and contends that the WC refund should "be used to reduce the specific costs to which they apply in the accounting period in which the purchase occurs." The Director, however, points to the second paragraph of Section 804, which provides that, where a refund is received in a subsequent accounting period, the refund should be used to offset the corresponding cost in the initial period "where possible," but "if this cannot be readily accomplished," the amount of the refund received in a subsequent period "may be used to reduce comparable expenses in the period in which they are received."

{¶44} The Director observed that appellant had received the WC premium refund in 1995 and had incorrectly reported it as income—not as a cost offset—on its CY 1995 cost report, contrary to the first sentence of Section 804 of HCFA Manual 15-1. Had appellant, at the time it received the WC refund in September 1995, instead elected to

have supplemented its cost reports for CYs 1991-1993 to reflect the refund, the Department could have revised appellant's per diem rates for FY 1993-1995, as the rate calculations for those periods had not yet become final. See R.C. 5111.27(B) and Ohio Adm.Code 5101:3-3-20(E) (authorizing a provider to furnish additional relevant cost information to the Department before calculation of an FY per diem rate has become final, even if the provider is time-barred from amending a cost report as a matter of right). But, appellant did not do so.

{¶45}  Appellant itself chose how it reported the refund. It did not advise the Department that the total refund included amounts attributable to prior CYs.  Rather, it reported the refund as a single sum income item without breakdown.[10] As observed by the Department, until the desk audit, "only [appellant]—and not the Department—knew about the refund and made the choice about how to report the refund."  (Appellee's brief, 10.) Moreover, the Director noted that "[h]ad the Department not audited [appellant's] cost report, the refund would never have come to [the Department's] attention."  (Oct. 23, 2006 Adjudication Order, 8.)

{¶46}  Had appellant wanted the Department to allocate its refund to the years to which it corresponded, it was appellant's obligation to timely provide the necessary information to the Department to allow that allocation.  Appellant simply did not do so, but itself chose to report the total amount of the refund as a 1995 lump sum and did so for the first time in its CY 1995 cost report filed on March 31, 1996.  As correctly observed by the trial court,"appellant initiated [the] outcome by choosing to report the refund *as a lump sum* in the 1995 cost report." (Emphasis added.) (Feb. 27, 2013 Decision, 13.)

{¶47}  Appellant argues that Section 804 imposed an obligation on the Department to itself reallocate the refunds to the earlier years.   We acknowledge that both providers and agencies may consult Section 804 to ascertain whether a cost report entry initially made by a provider is legally supportable.   But we reject appellant's contention that Section 804 imposed an affirmative obligation on the Department to

---

[10] We note that BWC issued the refund at issue in this case as a rate adjustment specific to appellant following  a rate protest filed by appellant.   BWC did not notify the Department of the refund nor the reason for it.  An employee of the BWC testified that BWC in 1995 issued a statewide rebate of premiums paid by employers on the basis that the state fund was overfunded.  However, the $62,480 rebate issued to appellant in 1995 was not such a refund.

itself reallocate the WC refunds to the earlier years or to unilaterally determine that another method of accounting for the refund might have been of benefit to appellant.

{¶48} We note that appellant now concedes that its "reported costs for BWC premiums incurred in 1995 should have been reduced by $4,264.00, the amount of the refund BWC attributed to 1995." (Appellant's Brief, 42.) However, it is also true that appellant did not take that position until *after* the Department's audit and rejection of inclusion of the refund as an income item. We will not apply the finality principle established in *Ohio Academy* to allow a provider to benefit from its own decision concerning its method of reporting costs, resulting in the calculation of a higher per diem rate in earlier years, then claim, after the final adjudication orders for those years have been issued, that the Department may no longer consider the effect of the chosen reporting method in calculating the per diem rate for a subsequent year later when the Department, in doing so, acts under the authority of relevant statutes, regulations or other governing authority, including Section 804.

{¶49} In summary, appellant *at a minimum* bore the burden of timely providing relevant allocation information to the Department if it desired the Department to allocate the CY 1991 and 1992 portions of the WC refund to impact the FY 1993 and 1994 per diem rates. Having not done so, appellant may not complain of the Department's failure to have itself allocated the refund to prior rate calculations. Because the FY 1993-1995 per diem rates had become final at the time of the hearing examiner's report and recommendation, the Department could assure proper Medicaid reimbursement with regard to appellant only by implementing the second option authorized by Section 804, i.e., using the total refund to "reduce comparable expenses in the period in which they are received," i.e., CY 1995. That is, the Department could no longer "readily accomplish" allocation of the refund to the accounting periods corresponding to the refunds because the rates for those years had been finally adjudicated at the administrative level and were no longer capable of being adjusted. *Ohio Academy.*

{¶50} We further reject appellant's argument that its "actual" 1995 costs must be deemed to be the difference between the amount of WC premiums paid in 1995 and the amount of the refund attributable solely to 1995, i.e., $4,263.56. It was reasonable for the Department to conclude that appellant's actual WC costs in 1995 totaled the amount of

the premiums it had paid in 1995 offset by the total amount of the refund the BWC received in 1995.

{¶51}   Ultimately, the issue in this case is whether appellant or the Department (which distributes taxpayer-generated funds) should bear the cost of the fact that the FY 1994-1996 per diem rates were final at the time the Department became aware that the WC  premium refund included amounts attributable to WC premium payments made in 1991-1994.  In view of the facts of this case, including the fact that appellant elected the manner of reporting the refund to the Department, we find that the Department did not violate Ohio's Medicaid reimbursement statutes in offsetting the entire amount of the refund against appellant's 1995 WC costs, consistent with Section 804.

{¶52}   Appellant argues that the Director's adjudication order requiring repayment of previously paid Medicaid reimbursements was irrational, unreasonable, and inconsistent with the statutory purposes of Ohio's Medicaid statutes.  We find, to the contrary,  that the Department's application of Section 804 to offset the full amount of the WC refund against appellant's 1995 WC costs was reasonable in that neither it nor appellant could  any longer "readily accomplish" allocation of the refund to prior-year closed audit periods.

{¶53}   We therefore overrule appellant's second assignment of error.

{¶54}   The trial court affirmed the Department's adjudication order as being supported by reliable, probative, and substantial evidence and in accordance with law. We find that the evidence was undisputed and sufficient to allow consideration of the sole issue upon which the parties differed.  That issue was whether the Department's adjudication order was in accordance with law.  We have found on de novo review of that issue of law that the order was in accordance with law.  Accordingly, the common pleas court did not abuse its discretion.

**III. Conclusion**

{¶55}   For the foregoing reasons, both of appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

TYACK and T. BRYANT, JJ., concur.

T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

———————————