[Cite as *Cameron v. Univ. of Toledo*, 2018-Ohio-979.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Kyle Cameron, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 16AP-834 |
| v. | : | (Ct. of Cl. No. 2015-00580) |
| University of Toledo, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

---

D E C I S I O N

Rendered on March 15, 2018

---

**On brief:** *Barone Law Offices*, and *Guy T. Barone*, for appellant. **Argued:** *Guy T. Barone*.

**On brief:** *Michael DeWine*, Attorney General, *Christopher P. Conomy*, and *Emily Simmons Tapocsi*, for appellee. **Argued:** *Emily Simmons Tapocsi*.

---

APPEAL from the Court of Claims of Ohio

DORRIAN, J.

{¶ 1} Plaintiff-appellant, Kyle Cameron, appeals the November 1, 2016 decision of the Court of Claims of Ohio rendering judgment following trial in favor of defendant-appellee, University of Toledo (the "University"). For the following reasons, we affirm in part and reverse in part.

**I. History**

{¶ 2} This matter arises out of an incident that occurred on July 12, 2011. Prior to 2011, Cameron was recruited and offered a full athletic scholarship in his sophomore year of high school to play football for the University. After he was recruited, Cameron began weight training at the University under the direction of Rudy Wade, head strength and conditioning coach for the University's football team. In summer 2011, Cameron, as an

incoming freshman, began training with the University's football team and took summer courses offered by the University.

{¶ 3} Beginning in June 2011, prior to the start of the academic year, all the University's football players, including incoming freshmen and upperclassmen, began a conditioning and training program at the University's football stadium and athletic facilities. The training program included weight training in the morning that was supervised by Wade, followed in the afternoon by a conditioning program referred to as "metabolics," which was supervised by upperclassmen. (Nov. 1, 2016 Decision at 1.)

{¶ 4} After the metabolics, all players departed for the day except for the offensive line players, who remained for what was referred to as "freshman Olympics" or the "O-line challenges." (Nov. 1, 2016 Decision at 2.) During the freshman Olympics, the freshman offensive line players would have to complete a series of activities as directed by the upperclassmen, who did not participate in the activities in anything other than a supervisory role. Some of the activities included a wheelbarrow race, dance contests, bear crawl, worm crawl, kicking or tackling a bag, and dunking a football above the crossbar of the goalposts.

{¶ 5} On July 12, 2011, following metabolics, the upperclassmen directed the freshman offensive line players to participate in the freshman Olympics. Cameron, who was a freshman offensive lineman but did not have an assigned spot on the team, participated. On that date, the upperclassmen instructed the freshmen to dunk a football above the crossbar of the goalposts. Following other players' attempts to dunk the football, Cameron jumped off a teammate's back, dunked the football, and then fell backward, landing on his head or neck. Cameron immediately began convulsing or seizing. Wade, who was present at the time of the incident, sent for John Walters, the football team's head athletic trainer. Walters found Cameron unconscious on the football field and instructed Billy Saul, a graduate assistant athletic trainer, to call 911. Cameron was taken by ambulance to the hospital. Allegedly, Cameron later learned he suffered brain damage, was no longer able to play football, and ultimately lost his scholarship.

{¶ 6} In 2013, Cameron filed a complaint in the Lucas County Court of Common Pleas alleging hazing, in violation of R.C. 2307.44, and negligence. That court dismissed the complaint, finding it lacked subject-matter jurisdiction. The judgment was affirmed on

appeal by the Sixth District Court of Appeals. *Cameron v. Univ. of Toledo*, 6th Dist. No. L-13-1284, 2014-Ohio-5587. In 2013, Cameron filed a complaint against the University only in the Court of Claims, which he voluntarily dismissed in 2014.

{¶ 7} On June 16, 2015, Cameron refiled a complaint against the University only in the Court of Claims alleging hazing, in violation of R.C. 2307.44, and negligence. On July 15, 2015, the University filed an answer. On December 14, 2015, the University filed a motion for leave to file amended answer. In its amended answer filed on the same date, the University asserted a statutory affirmative defense to Cameron's claim for hazing under R.C. 2307.44. The University asserted assumption of a known risk as an affirmative defense to Cameron's claim for negligence. On December 24, 2015, Cameron filed a memorandum in opposition to the University's motion for leave to file an amended answer. On February 4, 2016, the Court of Claims granted the University's motion for leave to file an amended answer.

{¶ 8} On March 21, 2016, the University filed a motion for partial summary judgment on the second cause of action. On March 25, 2016, Cameron filed a motion for summary judgment. On March 28, 2016, the University filed a motion for partial summary judgment on the first cause of action. Memoranda in opposition were filed as well as responses to the same.

{¶ 9} On June 7, 2016, the Court of Claims filed a decision finding that genuine issues of material fact remained on both of Cameron's claims and, therefore, denied Cameron's motion for summary judgment and the University's motions for partial summary judgment.

{¶ 10} Trial commenced on June 27, and ended June 29, 2016. On July 27, 2016, both Cameron and the University filed post-trial briefs. On November 1, 2016, the Court of Claims filed a decision rendering judgment in favor of the University.

## II. Assignments of Error

{¶ 11} Cameron appeals and assigns the following four assignments of error for our review:

> [I.] The trial court erred in holding that the affirmative defense of "actively enforcing a policy against hazing at the time the cause of action arose" applied in the instant case.

[II.] The trial court erred in holding that Cameron had failed to establish the required elements of hazing as set forth in the anti-hazing statute.

[III.] The trial court erred in holding that Cameron had failed to establish the required elements of his claim for negligence.

[IV.] The trial court erred in holding that Cameron's action was barred by the doctrine of primary assumption of the risk.

For ease of discussion, we consider Cameron's first and second assignments of error together and his third and fourth assignments of error together.

## III. Standard of Review

{¶ 12} Cameron's assignments of error involve both issues of law and fact. In considering whether the trial court's decision was in accordance with law, our review is plenary. *Cook v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-852, 2015-Ohio-4966, ¶ 16, citing *Bryant Health Care Ctr., Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 13AP-263, 2014-Ohio-92, ¶ 23; *Reywal Co. L.P. v. Dublin*, 10th Dist. No. 15AP-635, 2017-Ohio-367, ¶ 8, quoting *Campbell v. Carlisle*, 12th Dist. No. CA2009-05-053, 2009-Ohio-6751, ¶ 10 (" 'Interpretation of a statute is a matter of law and, thus, an appellate court must apply a de novo standard of review.' "). However, when considering whether the evidence supports the trial court's findings, we apply a manifest weight of the evidence standard of review.

{¶ 13} " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Rosenshine v. Med. College Hosps.*, 10th Dist. No. 11AP-374, 2012-Ohio-2864, ¶ 9, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Under the civil [manifest-weight-of-the-evidence] standard, examining the evidence underlying the trial judge's decision is a prerequisite to determining whether the trial court's judgment is supported by some competent, credible

evidence." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 40. *See also Eastley* at ¶ 15 ("The phrase 'some competent, credible evidence' * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence is competent and credible."). Accordingly, a reviewing court must weigh the evidence presented in the trial court.

{¶ 14} However, in weighing the evidence, we are mindful of the presumption in favor of the finder of fact. *Id.* at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) (noting that a reviewing court gives deference to the finder of fact because "the [finder of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony"). " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *Id.* at ¶ 21, quoting *Seasons Coal* at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-92 (1978). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10, citing *Eastley* at ¶ 20.

## IV. First and Second Assignments of Error—Hazing

{¶ 15} In his first and second assignments of error, Cameron asserts the Court of Claims erred in holding: (1) the affirmative defense of "actively enforcing a policy against hazing at the time the cause of action arose" as provided in R.C. 2307.44 applied in the instant case, and (2) he failed to establish the elements of hazing as provided in R.C. 2307.44.

## A. Applicable Law

{¶ 16} R.C. 2307.44 provides:

> Any person who is subjected to hazing, as defined in division (A) of section 2903.31 of the Revised Code, may commence a civil action for injury or damages, including mental and physical pain and suffering, that result from the hazing. The action may be brought against any participants in the hazing, any organization whose local or national directors, trustees, or

officers authorized, requested, commanded, or tolerated the hazing, and any local or national director, trustee, or officer of the organization who authorized, requested, commanded, or tolerated the hazing. If the hazing involves students in a primary, secondary, or post-secondary school, university, college, or any other educational institution, an action may also be brought against any administrator, employee, or faculty member of the school, university, college, or other educational institution who knew or reasonably should have known of the hazing and who did not make reasonable attempts to prevent it and against the school, university, college, or other educational institution. If an administrator, employee, or faculty member is found liable in a civil action for hazing, then notwithstanding Chapter 2743. of the Revised Code, the school, university, college, or other educational institution that employed the administrator, employee, or faculty member may also be held liable.

The negligence or consent of the plaintiff or any assumption of the risk by the plaintiff is not a defense to an action brought pursuant to this section. In an action against a school, university, college, or other educational institution, it is an affirmative defense that the school, university, college, or other institution was actively enforcing a policy against hazing at the time the cause of action arose.

{¶ 17} R.C. 2903.31(A) defines the act of hazing in the context of a criminal violation as "doing any act or coercing another, including the victim, to do any act of initiation into any student or other organization that causes or creates a substantial risk of causing mental or physical harm to any person."

## B. Whether Affirmative Defense Applies

{¶ 18} We begin by considering whether the affirmative defense to a claim of civil hazing applies. R.C. 2307.44 codifies the affirmative defense to civil hazing as follows: "In an action against a school, university, college, or other educational institution, it is an affirmative defense that the school, university, college, or other institution was actively enforcing a policy against hazing at the time the cause of action arose." In order for the affirmative defense to apply, the University bore the burden of proving the elements of the defense by a preponderance of the evidence. *Olentangy Condominium Assn. v. Lusk*, 10th Dist. No. 09AP-568, 2010-Ohio-1023, ¶ 23, quoting *MatchMaker Internatl., Inc. v. Long*, 100 Ohio App.3d 406, 408 (9th Dist.1995) (" 'It is well settled in Ohio that the defendant asserting an affirmative defense has the burden of proof in establishing such defense.' ");

*Aurora Loan Servs. LLC v. Sansom-Jones*, 10th Dist. No. 12AP-258, 2012-Ohio-5477, ¶ 25; *McCall v. Kranz*, 10th Dist. No. 15AP-436, 2016-Ohio-214, ¶ 9.

{¶ 19} Here, the Court of Claims concluded the affirmative defense of actively enforcing a policy against hazing applied because "[i]t was clearly established during trial by testimony and submitted exhibits that [the University] had an anti-hazing policy in effect at the time of the incident." (Nov. 1, 2016 Decision at 3.) However, the court also found that "[n]one of the freshman participants were aware of the school's anti-hazing policy at the time of [Cameron's] injury" and that "[t]his testimony is consistent with the fact that they did not receive the student handbook until after the injury." (Nov. 1, 2016 Decision at 4.) Furthermore, the court found that based on the testimony of Brian Lutz, the associate athletic director for compliance, "the specific anti-hazing policy with an effective date of February 2011 was not communicated to students until the beginning of the school year in August 2011, after [Cameron's] injury." (Nov. 1, 2016 Decision at 4.)

{¶ 20} Nevertheless, the Court of Claims found "the upperclassmen involved in the 'Olympics,' * * * should have been aware of the existence of the school's hazing policy * * * as evidenced by their signatures" acknowledging receipt of the 2009-2010 Student-Athlete Handbook, which "contained the same anti-hazing policy as the 2010-2011 edition." (Nov. 1, 2016 Decision at 4-5.) Finally, the court based its ultimate finding that the anti-hazing policy was actually being enforced on the testimony of Michelle Martinez-Solis, the dean of students at the time of the incident, regarding the measures taken by the University to enforce its policy against hazing.

{¶ 21} These findings are supported by competent, credible evidence as the record reflects that at the time of the incident, the University had a "Policy on hazing," which had an effective date of February 11, 2011. (Deft.'s Ex. I.) The policy provided in pertinent part as follows:

> The University of Toledo supports the autonomy of its student organizations within the established rules and regulations as outlined in the student handbook and other official University publications. Initiation into University organizations is permissible excluding any activities that may be construed as hazing.
>
> * * *

> When a student organization is found to be involved in hazing activity, the University shall have the authority to initiate disciplinary action regardless of the location of the activity. Such action shall be conducted in compliance with normal student organization conduct proceedings. Student organizations found in violation of the University hazing policy shall be subject to the range of sanctions available to the University as outlined in the student handbook.

In addition to the University's policy on hazing, the Student Code of Conduct in effect at the time of the incident prohibited "[h]azing or the commission of any act that causes or creates a substantial risk of causing physical or mental harm to another." (Deft.'s Ex. H.) Similarly, the Student Athlete handbook contained a statement in its "Code of Ethics" that "HAZING will not be tolerated," along with a definition of hazing. (Emphasis sic.) (Deft.'s Ex. F, Art. IV(B)(14).)

{¶ 22} Martinez-Solis testified she had indirect responsibility regarding enforcement of the policy on hazing as the office of student conduct was responsible for enforcing the policy, and the office of student conduct reported to her. Martinez-Solis testified that the University took steps to enforce the policy including sending an e-mail to every student at the beginning of the school year explaining hazing and holding an anti-hazing week with education for all students. Martinez-Solis addressed the students on the football team during the academic year, although she did not speak specifically about hazing. Martinez-Solis also testified regarding investigations of hazing undertaken during her time at the University.

{¶ 23} However, Martinez-Solis stated the athletic department did not report to her. Specifically, with regard to the policy on hazing, Martinez-Solis testified that "[t]he student football team is not [a] student organization." (Tr. Vol. III at 672.) This is notable given that the University's policy on hazing described disciplinary action only in the context of "a student organization * * * found to be involved in hazing activity." (Deft.'s Ex. I.) Thus, although the University had a policy against hazing at the time of the incident, such policy could be construed as only applicable to student organizations. Additionally, even if such policy did apply to the football team, according to Lutz, such policy was not communicated to the students until August 2011, after the incident in question occurred.

{¶ 24} Furthermore, although the University had an anti-hazing compliance form that was distributed to student organizations, the athletic teams were again not considered

student organizations. Martinez-Solis was unaware as to whether the football team had a hazing compliance form.

{¶ 25} Importantly, the record reflects that none of the freshmen who performed in the freshmen Olympics were aware of the policy on hazing or the statements prohibiting hazing in the Student Code of Conduct and Student Athlete Handbook, as such materials were not distributed until August 2011. Wade, a university agent who was present at the incident in question, testified he was not familiar with the University's policy on hazing. Furthermore, A.J. Lindeman, one of the upperclassmen on the football team at the time of the incident, stated he was unaware of the University's policy on hazing.[1] Nevertheless, although evidence was presented which could support a finding that the University's anti-hazing policy was not actively enforced against the football team, the evidence discussed below supports the Court of Claims' finding that the anti-hazing policy was actively enforced, even with the football team.

{¶ 26} Lutz testified as follows:

Q. Do you recognize what's at tab B?

A. Yes.

Q. What's that?

A. That's a copy of our Student Athlete Handbook.

Q. Who prepares the Student Athlete Handbook?

A. I do.

Q. Can you tell me about that? Is that an annual process?
A. Yes.

Q. Can you tell us about that process, please?

A. The process typically involves other members of our athletics department staff, depending upon their area of

---

[1] The Court of Claims discounted Lindeman's testimony that he was unaware of the policy on hazing by finding that the upperclassmen "should have been aware of the policy" because they signed the Student Athlete Handbook in prior years. However, the affirmative defense under R.C. 2307.44 does not require the University to demonstrate that students should have been aware of the policy on hazing. Rather, the University must carry the burden of demonstrating that it was actively enforcing the policy at the time of the incident. A student or university agent's lack of knowledge of the policy, while not determinative, is evidence tending to demonstrate that the policy was not being actively enforced.

expertise, where we subsection the handbook and ask for those offices to edit the handbook. And then once those edits are turned back into me, then I submit that to the publisher who then publishes the handbook. Ordinarily we ask for a deadline of August 1st to sort of align itself with report date for football and some of our other sports in the summer.

Q. Okay. And on the stand, under the T-shirt in front of you, you've seen that before, right?

A. I have.

MR. BARONE: What is that?

Q. Can you remind us what number that's been marked, plaintiff's exhibit?

A. That appears to be Exhibit 9.

Q. And what is that?

A. This is the Rocket handbook.

Q. What is the difference between the Rocket book and the Student Athlete Handbook that you've identified at tab B?

A. The Rocket Manual, that's a document that's created by the football staff and issued to football student athletes specifically. Where the Student Athlete Handbook is created by myself and other members of our staff and then disseminated to our entire student athlete population.

Q. So would the -- does the university have a softball team?

A. Yes.

Q. Would they get the Rocket Manual?

A. No, they wouldn't.

Q. Would they get the Student Athlete Handbook?
A. Yes.

Q. Can you describe in general what is the approach that the university takes and that you take in distributing the Student Athlete Handbook to student athletes?

A. The general process for distribution?

Q. Yes, please.

A. For most of our sports, we distribute the Student Athlete Handbook when we meet with them to start the academic year. And in that case, along with all the other documents that our student athletes are signing and submitting to us, we provide the handbook to them at that point and ask that they sign a document indicating that they received the handbook and that they understand the contents of the handbook, that they've listened to our rules education program. And if they've had the opportunity to ask questions, they've done so at that point.

Q. And who handles that distribution in getting the signatures?

A. I do.

Q. And who maintains those records once you have a signature on a record?

A. I do.

Q. Okay. If you would, please, turn to -- one moment, please -- in that same Student Athlete Handbook, Defendant's Exhibit B, if you'd turn to the page stamped 94, please, a few pages in.

A. Yes.

Q. Can you identify whether there's anything on that page addressing hazing?

A. Yes. Under the Code of Ethics, point 5.

Q. What is the title under that section?

A. It says hazing will not be tolerated.
Q. I'd like you to turn, if you would, to tab C. And if you could identify for the Court the pages that we see there.

A. Yes. These are copies of the student athlete signatures in the football program upon receipt of the Student Athlete Handbook.

Q. And what year does it list for the handbook version?

A. This document says 2009-10.

Q. And approximately when would you have had the students sign for that?

A. For this particular document, that would have been does after we had provided the handbooks to the football staff. And again, that would be when we meet with the team. It would have been early August. We normally meet with football the day or the night before they begin practice.

Q. Well, this -- if you're looking at the page marked 133, that doesn't have a date on it, does it?

A. It does not.

Q. Then how would you know that these guys got this handbook in August?

A. Simply by their signatures and the fact that this document would be been returned to me at some point later in August.

Q. If you would, on that first page, six lines down, can you identify the name on that line that's printed?

* * *

Q. And seeing those names there and the signatures, in your position with the university, what would that indicate to you?

A. That they've received the manual -- excuse me, the handbook, the Student Athlete Handbook.

Q. The version that we've just identified at tab B?

A. Tab B, that one looks to be the '10-'11 handbook.

Q. Okay. And turning to tab D.
A. D?

Q. Yes. Tab D. If you could simply identify that for us?

A. That's the 2007-08 handbook.

Q. And was that distributed to the student athletes through the same mechanism that you've described?

A. Yes.

Q. Turning to the next tab, E, it seems we've gotten two documents here, my apologies because we were only trying to get the second one. And it starts at what's marked page 209, and that should be Exhibit E. My apologies.

Starting with what's marked page 209, could you identify those pages, please?

A. Yes. Those are the student athlete signature pages for the Student Athlete Handbook in 2010-11 for the football program.

Q. Okay. And was that through the -- were those signatures on that document gained through the same process you've described?

A. Yes.

Q. And the next tab, please, would you identify what is at tab F for us?

A. Yes. This is the 2011-12 Student Athlete Handbook.

MR. BARONE: I'm sorry, which tab is that?

MR. CONOMY: Tab F.

Q. And was that distributed through the same mechanism?

A. Yes.

Q. Turning to the page stamped 218 in Exhibit F, can you identify what that has to say about hazing, if anything?

A. Yes. Again, under the Code of Ethics, item 5, hazing will not be tolerated.
Q. And then turning to tab G, if you would identify for us, please, those pages there.

A. These are the Student Athlete Handbook signatures from the 2011-12 academic year in the sport of football.

Q. Were those through the same mechanism we've described?

A. Yes.

Q. So around when would those students have signed for that version of the Student Athlete Handbook at the university?

A. That would have occurred in August. Some time, ordinarily, right around the beginning of classes is when they were distributed.

* * *

Q. Thank you. If the student athletes were given this policy that says hazing will not be tolerated, does that mean that they weren't subject to the Student Code of Conduct?

A. No.

Q. They were still subject to that code?

A. That's correct.

Q. And why would that be?

A. Because they're students at the University of Toledo.

(Tr. Vol. II at 475-85.)

{¶ 27} Robert Lisowski, a participant in the freshman Olympics, testified it was his understanding the hazing prohibition applied to football teams:

Q. Now, did Mr. Lutz tell you that or do you remember whether hazing applied to football teams?

A. Absolutely. It was -- yeah, I mean, any group.

Q. Right. It applied to football teams and members.

MR. BARONE: May I have one second, Judge?
THE COURT: Yes.

MR. BARONE: That's all I have, Your Honor, thank you.

MS. TAPOCSI: Your Honor, I have just two questions.

* * *

Q. There's a binder that's black in front of you. Mr. Barone asked you about how you -- about the hazing -- anti-hazing policy and you referenced signing for some documents. If I could get you to turn to the tab that's Exhibit E as in Edward. If you flip through -- there's page numbers at the bottom, but the page that's marked 210.

Do you recognize -- have you seen this document before?

A. Yes.

Q. And it references receiving a 2010-2011 University of Toledo Student Athlete Handbook and then there's a signature, right?

A. Yes.

Q. Is that your signature about halfway down?

A. Yes.

Q. And your name?

A. (Indicates affirmatively.)

Q. Is that a yes?

A. Yes.

Q. And were you signing because you had received a copy of the University of Toledo Student Athlete Handbook?

A. Yes.

Q. And did you receive that from Mr. Lutz?

A. Yes.

Q. Was it during this presentation that you learned about hazing?

MR. BARONE: Objection. I'm not sure that was established. But go ahead.

THE COURT: Overruled.

A. Yes.

Q. And then if I can have you flip to Exhibit D as in dog.

A. I'm there.

Q. Okay. Is this the Student Athlete Handbook that you would have received?

A. Yes.

Q. If I can have you -- there's page numbers, again, on this. If I can have you flip to what's Bates stamped 161 at the bottom. Do you see where it says hazing will not be tolerated?

A. Yes.

Q. Do you recall that being part of the Student Athlete Handbook that you received before the 2010 school year?

A. Yes.

MS. TAPOCSI: No further questions, Your Honor.

* * *

BY MR. BARONE:

Q. Your signature was contained on page 210. Do you have that in front of you? Of Exhibit E, Defendant's Exhibit E.

A. Yes.

Q. And when did you sign this document?

A. I don't know the exact date.

Q. So do you know whether the other individuals on this page signed the document at the same time or different times?

A. Yeah, we got together in our football meeting room, team football meeting room, and that's when Brian went over everything and we were required to sign the document.

Q. Brian Lutz. So did he go over this Defendant's Exhibit D, which consists of -- is that D or E -- which consists of page 150 to 205? Is that what you recall, going over all those pages?

A. I don't recall specifically what he went over. I know typically he had a presentation that he kind of summarized the handbook with.

Q. That's right. But do you recall discussing at the time the paragraph 5 of page 161?

A. He went over hazing, yes.

Q. He did. And when would this have been?

A. During this -- during the presentation that he held.

Q. What -- what year? What month?

A. It would be the week before camp.

Q. A week before camp. So sometime in July 2010, July of 2011. That's your recollection?

A. That's typically when they hold it.

Q. I mean, is that your recollection?

A. Yes.

Q. Okay. Now, was it Brian Lutz or Coach Beckman that gave you this handbook?

A. I'm pretty sure it was in our Rocket Manual.

Q. Oh, your recollection is it was part of the Rocket Manual?

A. But he went through the presentation -- I don't know don't remember if he gave it to us directly after the presentation or if it was presented to us a week later in our Rocket Manual.

But I remember, yeah, I mean, we were - -

Q. So what are you telling me? You could have signed this document, Defendant's Exhibit D, sometime -- you could have signed your signature sometime in August, but you got it in July? Is that what you're telling me?

A. I don't recall exactly when I got this and exactly when I signed the piece of paper.

Q. All right. But it's your best understanding or recollection that you received it along with the Rocket Manual?

A. I don't know for certain when I got it.

Q. Well, are we talking about one document or two documents? And my question is this: Was this part of the Rocket Manual, Defendant's Exhibit D?

A. To my knowledge, it was in the Rocket Manual.

Q. Okay. So your recollection is it was part of the Rocket Manual and it wasn't separate and apart. Is that right?

A. Yes.

(Tr. Vol. II at 395-401.)

{¶ 28} In conclusion, the record reflects that competent, credible evidence exists to support the Court of Claims' finding that the University's policy against hazing was being actively enforced at the time this action arose as required under R.C. 2307.44.

{¶ 29} Accordingly, we overrule the first assignment of error.

## C. Whether Elements of Hazing Were Met

{¶ 30} Having found to be supported by competent, credible evidence, the Court of Claims' finding that the affirmative defense of actively enforcing a policy against hazing applies in this matter, we next consider whether it is necessary for us to review the court's finding that Cameron failed to prove the elements of hazing.

{¶ 31} In order to establish a claim for civil hazing, pursuant to R.C. 2307.44 and 2903.31, Cameron was required to establish the following elements: (1) doing any act or coercing another, including the victim, to do any act, (2) such act must be an act of initiation into any student or other organization, and (3) such act must cause or create a substantial risk of causing mental or physical harm to any person. As noted above, however, actively enforcing a University policy against hazing is an affirmative defense against a civil hazing claim.

{¶ 32} The affirmative defense having been established in this case, we find it is not necessary for us to review the Court of Claims' finding that the elements of a civil hazing claim had not been met.

{¶ 33} Cameron filed the complaint against the University only. Although he named individuals in the complaint filed in the Lucas County Court of Common Pleas, he did not name individuals as defendants in the complaint before us. Therefore, as the University is the only defendant, the finding that the University was actively enforcing an anti-hazing policy is determinative of Cameron's claim. Although the Court of Claims addressed whether Cameron established the elements of hazing, we decline to do so.

{¶ 34} Accordingly, we dismiss as moot the second assignment of error.

## V. Third and Fourth Assignments of Error—Negligence

{¶ 35} In his third and fourth assignments of error, Cameron asserts the Court of Claims erred in holding that he failed to establish the elements of his claim for negligence and that his claim for negligence was barred by the doctrine of primary assumption of the risk.

{¶ 36} Although not named as defendants in the complaint, Cameron alleged Tim Beckman, John Walters, Rudy Wade, Cameron Paulson, Kenneth Morris, and Billy Saul were negligent: (1) by failing to supervise the freshman Olympics and stop the goal post dunk, and (2) by not following required concussion prevention plans, including requiring a helmet. Cameron alleged the University was negligent, pursuant to the doctrine of respondeat superior, and vicarious liability as Beckman, Walters, Wade, Paulson, Morris, and Saul were acting within the scope of their employment with the University when they acted in an allegedly negligent manner.[2]

### A. Negligence and Respondeat Superior

{¶ 37} "In general, a cause of action for negligence requires proof of (1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 23, citing *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984). *See also Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981), citing *Feldman v. Howard*, 10 Ohio St.2d 189, 193 (1967).

---

[2] We note that Cameron also alleged that the coaches and staff were "willful, wanton and reckless." (Comp. at ¶ 15, 27.) However, Cameron did not name the individuals in the complaint filed in the Court of Claims and the court did not address the willful, wanton, and reckless allegations. For these reasons, we decline to do so as well.

{¶ 38} The Supreme Court of Ohio has stated that:

> Respondeat superior speaks only to the vicarious liability of an *employer*; it does not simultaneously create an express cause of action against individual agents and servants of the employer. "Respondeat superior" means "[l]et the *master* answer," and * * * the phrase was defined as the doctrine holding "a *master* * * * liable in certain cases for the wrongful acts of his servant, and a *principal* for those of his agent." (Emphasis added.) Black's Law Dictionary 1546 (3d Ed.1933).

*Hauser v. Dayton Police Dept.*, 140 Ohio St.3d 268, 2014-Ohio-3636, ¶ 11. The Court of Claims did not conduct an analysis of respondeat superior. Rather, the court found the defense of primary assumption of the risk barred Cameron's claim for negligence.

## B. Primary Assumption of the Risk

{¶ 39} The University asserted an affirmative defense as follows: "The damages alleged by [Cameron] were the result, if at all, of [Cameron's] assumption of a *known* risk." (Emphasis added.) (Answer at ¶ 6.)

{¶ 40} Although the Court of Claims determined that primary assumption of the risk applied, it is not clear that the University asserted the defense of *primary* assumption of the risk as the answer refers to assumption of a *known* risk. The reference to a known risk is more akin to implied or secondary assumption of risk. The court, however, did not conduct an analysis of implied assumption of the risk.

{¶ 41} Ohio recognizes three types of assumption of the risk as defenses to a claim of negligence: express, primary, and implied or secondary. *Schnetz v. Ohio Dept. of Rehab. & Corr.*, 195 Ohio App.3d 207, 2011-Ohio-3927, ¶ 21 (10th Dist.), citing *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, ¶ 10 (10th Dist.). We have explained express and implied assumption of the risk as follows:

> "Express assumption of the risk applies when parties expressly agree to release liability." *Crace* at ¶ 11. "Implied assumption of risk is defined as plaintiff's consent to or acquiescence in an appreciated, known or obvious risk to plaintiff's safety." *Collier v. Northland Swim Club*, 35 Ohio App.3d 35, 37 (10th Dist.1987). "Under this approach to assumption of risk, defendant owes to plaintiff some duty, but it is plaintiff's acquiescence in or appreciation of a known risk that acts as a defense to plaintiff's action." *Id.*

*Ochall v. McNamer*, 10th Dist. No. 15AP-772, 2016-Ohio-8493, ¶ 33.

{¶ 42} Under the doctrine of primary assumption of the risk, a person who voluntarily engages in a recreational or sporting activity assumes the inherent risks of that activity and cannot recover for injuries resulting from the activity unless the defendant acted recklessly or intentionally in causing the injuries. *Morgan v. Kent State Univ.*, 10th Dist. No. 15AP-685, 2016-Ohio-3303, ¶ 12; *Marchetti v. Kalish*, 53 Ohio St.3d 95 (1990), paragraph one of the syllabus. *See also Crace* at ¶ 12, citing *Ballinger v. Leaniz Roofing, Ltd.*, 10th Dist. No. 07AP-696, 2008-Ohio-1421, ¶ 8, citing *Anderson v. Ceccardi*, 6 Ohio St.3d 110, 114 (1983) (noting that Ohio courts have historically applied the doctrine of primary assumption of the risk in sporting events). Underlying the doctrine is the rationale that because sporting activities have certain inherent risks, participants tacitly consent to the risks involved. *Morgan* at ¶ 12, citing *Crace* at ¶ 13, citing *Collier v. Northland Swim Club*, 35 Ohio App.3d 35, 37 (10th Dist.1987).

{¶ 43} When considering a defense of primary assumption of the risk, "the injured plaintiff's subjective consent to and appreciation for the inherent risks are immaterial to the analysis." *Crace* at ¶ 16, citing *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, ¶ 9, citing *Ramos v. Countryside*, 137 Ill.App.3d 1028, 1031-32 (1985). Thus, even persons " 'entirely ignorant of the risks of a sport, still assume the risk * * * by participating in a sport or simply by attending the game. The law simply deems certain risks as accepted by plaintiff regardless of actual knowledge or consent.' " (Footnotes omitted.) *Gentry* at ¶ 12, quoting Susan M. Gilles, *From Baseball Parks to the Public Arena: Assumption of the Risk in Tort Law and Constitutional Libel Law*, 75 Temple L.Rev. 231, 236 (2002).

{¶ 44} Although it is not clear that the University asserted primary assumption of the risk, rather than implied or secondary assumption of the risk, because the Court of Claims determined that primary assumption of the risk applies, we will consider the same. This court has stated that " ' "primary assumption of [the] risk requires an examination of the activity itself and not plaintiff's conduct. If the activity is one that is inherently dangerous and from which the risks cannot be eliminated, then a finding of primary assumption of [the] risk is appropriate." ' " *Morgan* at ¶ 15, quoting *Morgan v. Ohio Conference of the United Church of Christ*, 10th Dist. No. 11AP-405, 2012-Ohio-453, ¶ 15, quoting *Gehri v. Capital Racing Club, Inc.*, 10th Dist. No. 96APE10-1307 (June 12, 1997).

{¶ 45} In order for the doctrine of primary assumption of risk to apply, a court must find that: (1) the danger is ordinary to the activity, (2) it is common knowledge that the danger exists, and (3) the injury occurs as a result of the danger during the course of the activity. *Morgan*, 2016-Ohio-3303, at ¶ 12; *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, ¶ 12 (10th Dist.). " 'To be covered under the [primary-assumption-of-the-risk] doctrine, the risk must be one that is so inherent to the sport or activity that it cannot be eliminated.' " *Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, ¶ 19, quoting *Konesky v. Wood Cty. Agricultural Soc.*, 164 Ohio App.3d 839, 2005-Ohio-7009, ¶ 19 (6th Dist.), citing *Westray v. Imperial Pools & Supplies, Inc.*, 133 Ohio App.3d 426, 432 (6th Dist.1999). "Where the risk at issue is not inherent, then a negligence standard applies." *Id.*

{¶ 46} "The affirmative defense of primary assumption of the risk completely negates a negligence claim because the defendant owes no duty to protect the plaintiff against the inherent risks of the recreational activity in which the plaintiff engages." *Morgan*, 2012-Ohio-453, at ¶ 14, citing *Crace* at ¶ 15, citing *Gentry* at ¶ 11, citing Prosser & Keeton, *The Law of Torts*, Section 68, at 496 (5th Ed.1984). *See Ballinger* at ¶ 8. " 'Because a successful primary assumption of risk defense means that the duty element of negligence is not established as a matter of law, the defense prevents the plaintiff from even making a prima facie case.' " *Wolfe v. Bison Baseball, Inc.*, 10th Dist. No. 09AP-905, 2010-Ohio-1390, ¶ 21, quoting *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 431-32 (1996). "Because of the great impact a ruling in favor of a defendant on primary assumption of risk grounds carries, a trial court must proceed with caution when contemplating whether primary assumption of risk completely bars a plaintiff's recovery." *Gallagher* at 432. Application of the doctrine of primary assumption of the risk is a question of law that is reviewed de novo on appeal. *Crace* at ¶ 12, citing *Gallagher* at 435; *Foggin v. Fire Protection Specialists, Inc.*, 10th Dist. No. 12AP-1078, 2013-Ohio-5541, ¶ 8.

{¶ 47} Here, the Court of Claims found that the defense of primary assumption of the risk applied because "it was well-established during trial that the 'Olympics' were team-building activities meant to develop camaraderie." (Nov. 1, 2016 Decision at 21.) The court found that although "[t]he activities may not have been a scheduled activity for the day and may not have led directly to any increased physical capacity related to the players' on-field

performance," they were nevertheless "football activities" because "they served a function related to the success of the offensive line and the team." (Nov. 1, 2016 Decision at 21.) Therefore, the court concluded "when [Cameron] voluntarily chose to participate, more specifically, when he chose to run and jump off of the back of another player to dunk the football over the goal post, he assumed the inherent risks associated with that choice." (Nov. 1, 2016 Decision at 21.)

{¶ 48} We disagree with the Court of Claims that the jumping off the back of another player to dunk a football over the goal post is so inherent to the game of football or to team building that it cannot be eliminated. Therefore, the Court of Claims erred in finding that the defense of primary assumption of the risk applied.

{¶ 49} Accordingly, the third assignment of error is sustained.

## C. Negligence

{¶ 50} Having found that the Court of Claims erred in applying the defense of primary assumption of the risk, we next consider whether the court erred by finding that Cameron failed to establish any of the elements of his claim for negligence.

### 1. Duty

{¶ 51} " 'Duty, as used in Ohio tort law, refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff.' " *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, ¶ 23, quoting *Commerce & Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989). *See Morgan*, 2012-Ohio-453, at ¶ 11, citing *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645 (1992). The Supreme Court has stated that "the existence of a duty depends upon the foreseeability of harm: if a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied." *Wallace* at ¶ 23, citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 680 (1998). Additionally, it is recognized that the duty element of negligence may be established by common law, legislative enactment, or the particular circumstances of a case. *Id.*, citing *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565 (1998).

{¶ 52} "The scope of any duty owed is the standard of care that an actor must exercise." *Cromer* at ¶ 27, citing *Commerce & Industry*. "The minimum standard of care

expected under any circumstances is to exercise that degree of care and caution that an ordinarily careful and prudent person would exercise under similar circumstances." *Id.*, citing *Gedeon v. E. Ohio Gas Co.*, 128 Ohio St. 335, 338 (1934). The existence of a duty is a question of law; therefore, we apply a de novo standard of review. *Wallace* at ¶ 22; *Quaye v. N. Mkt. Dev. Auth., Inc.*, 10th Dist. No. 15AP-1102, 2017-Ohio-7412, ¶ 22, citing *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).

{¶ 53} Here, with regard to the element of duty, the Court of Claims made the following findings:

> In an effort to establish a duty owed to [Cameron] by Rudy Wade, [Cameron] submitted Rudy Wade's employment contract with [the University]. In his position summary, the document states that one of Mr. Wade's duties is to "ensure the safety of our student athletes."
>
> John Walters had a similar duty regarding the safety of athletes in his contract, including protecting them from injury and illness.
>
> However, [Cameron] has failed to establish that he was an intended beneficiary with enforceable rights in the contractual relationships between either Rudy Wade or John Walters. *See Hill v. Sonitrol of Sw. Ohio, Inc.*, 36 Ohio St.3d 36 * * * (1988); *State ex rel. DeWine v. Mastergard*, 10th Dist. Franklin No. 14AP-1024, 2016-Ohio-660.

(Nov. 1, 2016 Decision at 16-17.) Furthermore, the court found that "[e]ven if [Cameron] had established that he had enforceable rights in the contracts, a breach of those contract[s] does not inherently give rise to a negligence claim." (Nov. 1, 2016 Decision at 17.) The Court of Claims also concluded that the bylaws of the National Collegiate Athletic Association ("NCAA") did not establish a duty of care, and that "[e]ven if NCAA bylaws did create a legal duty, such duty would only exist during the official, scheduled portions of the training, i.e. the weight training/conditioning and 'metabolics.' " (Nov. 1, 2016 Decision at 17.)

{¶ 54} On appeal, Cameron argues that the very terms of the employment contracts between the University, Wade, and Walter "were entered into with the protection of student athletes explicitly in mind." (Cameron's Reply Brief at 17.) Cameron urges the court to find that the employment contracts "explicitly place upon Wade and Walters, the duty of ensuring the safety of student athletes." (Cameron's Reply Brief at 17-18.) We agree with

Cameron that the student athletes were the intended beneficiaries of Walter's and Wade's contractual duties to ensure the safety of student athletes and protect them from injury and illness. We also agree, however, as Cameron acknowledges, that the employment contracts, standing alone, do not give rise to a duty for purposes of a negligence claim.[3]

{¶ 55} With this in mind, Cameron urges the court to consider that a duty of care arises from the particular circumstances of this case. He urges us to consider not only Walter's and Wade's contractual duties, but also the relationship between the University and Cameron, its scholarship athlete, and/or between the University's agents as coaches and Cameron as athlete, as well as the foreseeability of harm resulting from the goal post dunk and from failing to stop such activity.

{¶ 56} The Court of Claims observed that "there is very little case law establishing a common law duty of care for coaches to their respective players." (Nov. 1, 2016 Decision at 18.) Cameron acknowledges the same. Our independent research revealed only one Ohio court that acknowledged a potential duty from such a relationship. In *Limerick v. Euclid Bd. of Edn.*, 69 Ohio App.3d 807 (8th Dist.1990), the Eighth District Court of Appeals observed that "there may be a general duty to supervise an athlete by giving adequate instruction, supplying proper equipment and supervising the particular contest." *Id.* at 810. In considering whether a common-law duty of care exists, we are mindful that "[t]he common-law duty of due care is that degree of care which an ordinarily reasonable and prudent person exercises, or is accustomed to exercising, under the same or similar circumstances. A person is to exercise that care necessary to avoid injury to others." (Citations omitted.) *Mussivand* at 318-19. Given the circumstances here, as outlined in this discussion of duty, this court finds that Walters and Wade had a common-law duty of care to Cameron consistent with due care a coach under same or similar circumstances would have.

{¶ 57} More significant in this case than any common-law duty is the presence of foreseeability. The Court of Claims acknowledges that "the specific facts of the case may

---

[3] This court has previously held: "A breach of contract claim does not create a tort claim, and a tort claim based upon the same actions as those upon which a breach of contract claim is based exists only if the breaching party also breaches a duty owed separately from that duty created by the contract, that is, a duty owed even if no contract existed." *Prater v. Three-C Body Shop, Inc.*, 10th Dist. No. 01AP-950, 2002-Ohio-1458, citing *Textron Financial Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 151 (9th Dist.1996). *See also Gold Craft Co. v. Ebert's Contracting & Remodeling, LLC*, 10th Dist. No. 09AP-448, 2010-Ohio-3741, ¶ 21.

give rise to a duty of care." (Nov. 1, 2016 Decision at 18.) This court further observes that Wade, Walters, and Lutz testified the goal post dunk was a dangerous activity. (Nov. 1, 2016 Decision at 14-15, 18.) Such testimony supports a finding of foreseeability of harm for purposes of the existence of a duty.

{¶ 58} Under the particular circumstances of this case, on this question of law, we find that Walters and Wade owed Cameron a duty of care. We make this determination based on: (1) Walters' and Wade's contractual duties to protect and keep safe student athletes, (2) a common-law duty between a coach and student athletes under same or similar circumstances, and (3) the foreseeability of the harm suffered by Cameron.

{¶ 59} Accordingly, we conclude the Court of Claims erred in finding a duty did not exist.

### 2. Scope and Breach of Duty

{¶ 60} Although it found that the University, Walters, and Wade owed no duty to Cameron, the court addressed the issue of whether a duty was breached—at least in the context of a duty "momentarily" arising. The court concluded that "the goal post dunk was only dangerous in the manner performed by [Cameron]" and, therefore, "even if a duty arose momentarily" between the time that "the dangerous condition arose and the injury occurred," it was "not unreasonable" for Wade to have failed to stop the activity and prevent the injury. (Nov. 1, 2016 Decision at 18-19.)

{¶ 61} The University argues this conclusion was supported by the record and in so doing states "[Cite to Trans [sic]]," but does not refer this court to any specific transcript pages or places in the record to support this argument.[4] (University's Brief at 23.)

{¶ 62} As this court has now determined that a duty of care existed, beyond "momentarily," we remand to the Court of Claims to consider and determine the scope of the duty and whether a breach of the same occurred based on the facts of the case. "Whether the defendant breached a duty is normally a question of fact for the trier of fact to decide." *Miller v. Ohio Dept. of Transp.*, 10th Dist. No. 13AP-849, 2014-Ohio-3738, ¶ 42. The existence of a duty is ordinarily a question of law, "but a question as to the scope and

---

[4] App.R. 16(B) and (A)(6) and (7) and (D) requires the parties to refer to the record in support of the arguments it makes. "[I]t is not this court's function to comb the record to search for evidence supporting a party's argument." *Tredenary v. Fritz*, 11th Dist. No. 2017-L-045, 2017-Ohio-8632, ¶ 29; *Kitchen v. Welsh Ohio, LLC*, 10th Dist. No. 01AP-1003, 2002-Ohio-4012, ¶ 25.

extent of that duty is ultimately a question of fact, for the trier of fact." *Jenkins v. Ohio State Univ. Hosps.*, 10th Dist. No. 96API01-119 (July 23, 1996); *Slagle v. White Castle Sys., Inc.,* 79 Ohio App.3d 210, 216 (10th Dist.1992), citing *Mussivand* at 318. Therefore, we decline to make this determination in the first place and remand the case to the Court of Claims to consider the facts in light of our legal finding that a duty of care existed.

### 3. Causation

{¶ 63} "[N]egligence is without legal consequence unless it is a proximate cause of an injury." *Whiting v. Ohio Dept. of Mental Health*, 141 Ohio App.3d 198, 202 (10th Dist.2001), citing *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986). " 'The rule of proximate cause "requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act." ' " *Eastman v. Stanley Works*, 180 Ohio App.3d 844, 2009-Ohio-634, ¶ 40 (10th Dist.), quoting *Jeffers v. Olexo*, 43 Ohio St.3d 140, 143 (1989), quoting *Ross v. Nutt*, 177 Ohio St. 113, 114 (1964). *See Quaye* at ¶ 23, citing *Whiting* at 202. "[A] defendant's conduct is a cause of the event (or harm) if the event (or harm) would not have occurred *but for* that conduct; conversely, the defendant's conduct is not the cause of the event (or harm) if the event (or harm) would have occurred regardless of the conduct." (Emphasis sic.) *Anderson v. St. Francis-St. George Hosp., Inc.*, 77 Ohio St.3d 82, 84-85 (1996), citing Prosser & Keeton, *Law of Torts*, at 266 (5 Ed.1984). "Ordinarily, proximate cause is a question of fact for the jury." *Eastman* at ¶ 42, citing *Strother* at 288, citing *Clinger v. Duncan*, 166 Ohio St. 216, 223 (1957).

{¶ 64} In this case, the Court of Claims examined whether Cameron's injuries would have been prevented if the University had provided him with a helmet or if the University had a trainer on the field at the time of the injury. The court found that "even if [Cameron] were wearing a helmet, it would not have prevented his injuries." (Nov. 1, 2016 Decision at 19-20.) Additionally, the court concluded "[Cameron] has failed to establish that the lack of a trainer on the field at the time of the injury was a proximate cause of said injury or that his injuries would have been mitigated had an athletic trainer been present." (Nov. 1, 2016 Decision at 20.) Instead, the court found:

> [T]he proximate cause of [Cameron's] injuries was his decision
> to jump off of the back of another player, something which

> according to [the University's] expert substantially increased the forces acting on his body when he fell and struck the playing surface. It was ultimately the height [Cameron] achieved by using another player's back as a springboard, coupled with the angle at which he grasped the goal post crossbar, that caused his injuries.

(Nov. 1, 2016 Decision at 20.)  Finally, the court found that "no player or coach told Mr. Cameron that he needed to jump off of another player's back to perform the goal post dunk, nor did any agent of the university tell him he had to participate in the 'Olympics.' " (Nov. 1, 2016 Decision at 20.)

{¶ 65} Here, the Court of Claims limited its discussion of whether proximate cause was established based on whether the University was required to provide helmets or have a trainer present on the field.[5]  On remand, however, the issue for the court to consider is whether Cameron's injury is the natural and probable consequence of the negligence alleged, namely the failure of the University to stop the activity in question.

{¶ 66} Cameron, in his post-trial brief, argued that "[a]s Rudy Wade's deposition demonstrates, he was present during the 'Olympics,' the dunk contest of July 12, 2011 and did nothing to stop it. * * * Rudy Wade failed to adequately supervise the conduct of the players as he was required."  (Cameron's Post-Trial Brief at 25-26.)  Cameron also argued that Walters and the head football coach knew or should have been aware of the freshman Olympics and were under an obligation to stop them.  Thus, the issue of whether the University's failure to stop the activity was the proximate cause of Cameron's injury was properly before the Court of Claims.

{¶ 67} Therefore, we conclude the Court of Claims fell short in its analysis of proximate cause. Accordingly, on remand, the court must determine whether the evidence in this case establishes that Cameron's injuries were the natural and probable consequence of the University's failure to stop the activity in question.

{¶ 68} Accordingly, we sustain Cameron's fourth assignment of error.

## VI. Conclusion

{¶ 69} Having overruled the first assignment of error, dismissed the second assignment of error as moot and sustained the third and fourth assignments of error, we

---

[5] On appeal, Cameron does not dispute the court's findings regarding failure to provide a helmet and lack of a trainer on the field at the time of injury.

affirm in part, reverse in part, and remand this case to the Court of Claims of Ohio to proceed consistent with this decision.

*Judgment affirmed in part,*
*reversed in part; cause remanded.*

BRUNNER, J., concurs.
KLATT, J., dissents.

KLATT, J., dissenting.

{¶ 70} Because I would affirm the Court of Claims' decision in its entirety, I respectfully dissent.

{¶ 71} The majority decision accurately sets out the test for the application of the doctrine of primary assumption of risk. In order for the doctrine of primary assumption of risk to apply, a court must find that: (1) the danger is ordinary to the activity, (2) it is common knowledge that the danger exists, and (3) the injury occurs as a result of the danger during the course of the activity. *Ochall v. McNamer*, 10th Dist. No. 15AP-772, 2016-Ohio-8493, ¶ 34; *Morgan v. Kent State Univ.*, 10th Dist. No. 15AP-685, 2016-Ohio-3303, ¶ 12; *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, ¶ 12 (10th Dist.). To be covered under the primary-assumption-of-risk doctrine, the risk must be one that is so inherent to the sport or activity that it cannot be eliminated. *Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, ¶ 19. In applying the doctrine, the focus is on the nature of the activity and not the participant's conduct. *Ochall* at ¶ 36, quoting *Gehri v. Capital Racing Club, Inc.*, 10th Dist. No. 96APE10-1307 (June 12, 1997). The affirmative defense of primary assumption of risk, when established, completely negates a negligence claim because the defendant owes no duty to protect the plaintiff against the inherent risks of the recreational activity in which the plaintiff engages. *Morgan* at ¶ 14. Whether to apply the affirmative defense of primary assumption of the risk presents an issue of law for the court to determine. *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, ¶ 12 (10th Dist.). An appellate court reviews a trial court's application of the doctrine de novo. *Ochall* at ¶ 39.

{¶ 72} The activity at issue here is dunking a football over the crossbar of a football goal post. Falling is an obvious, ordinary and inherent risk of this activity that cannot be eliminated. Cameron was injured when he voluntarily jumped off the back of another

player and fell backwards after losing his grip on the crossbar. These facts, as determined by the Court of Claims after a trial, present all the necessary elements for application of the doctrine of primary assumption of risk. For these reasons, I would affirm the Court of Claims' application of the doctrine of primary assumption of risk and overrule appellant's fourth assignment of error.

{¶ 73} I also disagree with the majority's decision to sustain appellant's third assignment of error. Even if the university, through its coaches, owed appellant a duty, the Court of Claims found no breach of that duty. This finding was based upon the Court of Claims' assessment of the evidence. There is competent credible evidence in the record to support the court's conclusion. Specifically, there is evidence in the record supporting the Court of Claims' finding that the coach did not have sufficient opportunity to observe and stop the crossbar dunking activity as performed by appellant. Therefore, I would also overrule appellant's third assignment of error.

{¶ 74} I agree with the majority's disposition of the first and second assignments of error.

{¶ 75} For these reasons, I respectfully dissent.

———————————