[Cite as *Mohler v. Univ. of Toledo Athletic Dept.*, 2025-Ohio-4961.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Caitlin Mohler, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 25AP-248 |
| v. | : | (Ct. of Cl. No. 2023-00630JD) |
| University of Toledo Athletic Department, | : | (ACCELERATED CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on October 30, 2025

**On brief:** *K Street Law*, *LLC*, and *Katie Street*; *Taylor Dykema*, *PLLC*, and *Meredith Lloyd*, for appellant. **Argued:** *Meredith Lloyd.*

**On brief:** *Dave Yost*, Attorney General, *Peter E. DeMarco*, and *Daniel J. Benoit*, for appellee. **Argued:** *Peter E. DeMarco.*

APPEAL from the Court of Claims of Ohio

DORRIAN, J.

{¶ 1} Plaintiff-appellant, Caitlin Mohler, appeals from a judgment of the Court of Claims of Ohio granting summary judgment in favor of defendant-appellee, University of Toledo Athletic Department ("UT"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} In 2020, appellant was recruited as a goalkeeper to play on UT's women's soccer team. She began attending UT in spring 2022. In June 2022, appellant was dismissed from the team.

{¶ 3} In September 2023, appellant commenced an action against appellee in the Court of Claims seeking compensatory damages for negligent misrepresentation, promissory estoppel, and negligence claims relating to her dismissal from the team.

{¶ 4} In her complaint, appellant alleged that, in 2020, she accepted an athletic and academic scholarship package totaling $72,753 to play soccer at UT as part of the 2022 recruiting class. Based on a conversation with T.J. Buchholz, the head coach of the soccer team, appellant decided to graduate early from high school and begin attending UT in early spring 2022. In the 2022 spring semester, appellant was not yet on an athletic scholarship.

{¶ 5} Appellant alleged that, as a result of a physical examination required by the National Collegiate Athletic Association ("NCAA") prior to her athletic participation, UT's doctor recommended she have surgery on her knee. Appellant alleged that the surgery was required for her participation on the team but that Coach Buchholz told her that her scholarship would remain intact as long as there was a viable road for recovery following the surgery.

{¶ 6} Appellant alleged that, both prior to and after surgery in spring 2022, assistant coach Jaelyn Cunningham belittled her, embarrassed her, and isolated her from the rest of the team. In her complaint, appellant described a meeting with Coach Cunningham in April 2022 during which the coach yelled at her and told her she was "the type of player I don't want on this team." (Sept. 25, 2023 Compl. at ¶ 25.) Appellant alleged that her treatment by coaching staff induced anxiety and mental health issues.

{¶ 7} After appellant spoke to some of her teammates regarding her interaction with the coaching staff at a team party, her teammates contacted the coaches. According to appellant, numerous meetings between her and the coaching staff followed in an attempt to resolve their conflicts, but the meetings involved the coaching staff yelling, belittling, and using abusive language toward appellant. Appellant alleged that she attempted to apologize to Coach Cunningham for "the way that the team found out" about appellant's concerns about her treatment, but Coach Cunningham accused her of lying to her teammates and demanded that appellant apologize to the team and coaching staff or be dismissed. Appellant alleged that, "[b]ecause of her refusal to lie, [she] was ultimately dismissed from the team and her scholarship was taken away." (Compl. at ¶ 29, 32.)

{¶ 8} Appellant alleged that the situation caused her to seek off-campus mental health counseling and incur bills for physical therapy and recovery related to her knee

surgery. Appellant also alleged she was unable to enter the NCAA transfer portal in order to play soccer elsewhere after her dismissal from UT because UT informed her she had not signed a binding National Letter of Intent ("NLI").

{¶ 9} In October 2024, appellee moved for summary judgment, arguing that it was entitled to immunity for appellant's claims and, in the alternative, appellant could not state a claim for relief.

{¶ 10} On January 31, 2025, the Court of Claims entered judgment granting appellee's motion for summary judgment. On the issue of appellee's immunity, the court stated as follows:

> Ultimately, Plaintiff's argument is not about the manner in which she was removed from the team, but her removal altogether as she lost her potential Fall 2022 scholarship opportunity. Accordingly, Plaintiff's contention that she is arguing against the manner in which she was removed from the team, not her removal, is unpersuasive, and the only reasonable conclusion is that Defendant is entitled to discretionary immunity for the decision to remove her from the team.

(Internal citations omitted.) (Jan. 31, 2025 Decision at 15.) Despite finding that appellee was entitled to discretionary immunity for the decision to remove appellant from the soccer team, the Court of Claims also addressed the merits of appellant's negligent misrepresentation, promissory estoppel, and negligence claims and concluded that appellee was also entitled to judgment as a matter of law on those claims.

## II. Assignments of Error

{¶ 11} Appellant appeals and assigns the following four assignments of error for our review:

> [I.] The trial court erred in granting summary judgment to the University of Toledo Athletic Department ("UT") since genuine issues of material fact exist.
>
> [II.] The trial court erred in granting summary judgment to Defendant-Appellee on Plaintiff-Appellant's claim of negligent misrepresentation as a result of its failure to construe the facts in a light most favorable to Plaintiff-Appellant.
>
> [III.] The trial court erred in granting summary judgment to Defendant-Appellee on Plaintiff-Appellant's promissory

estoppel claim based on a finding of fact, rather than an operation of law.

[IV.] The trial court erred in granting summary judgment to Defendant-Appellee on Plaintiff-Appellant's negligence claim based on an erroneous conclusion that no common-law duty of care is owed to student athletes to prevent hostile or abusive conduct by athletic coaching staff.

## III. Discussion

{¶ 12} Each of appellant's assignments of error argue that the Court of Claims erred in granting summary judgment to appellee. A grant of summary judgment is reviewed on appeal under a de novo standard. *Capella III, LLC v. Wilcox*, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Andersen v. Highland House Co.*, 2001-Ohio-1607. "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotations and citations omitted.) *Holt v. State*, 2010-Ohio-6529, ¶ 9 (10th Dist.). Summary judgment is appropriate where "the moving party demonstrates that: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made." *Capella III* at ¶ 16, citing *Gilbert v. Summit Cty.*, 2004-Ohio-7108, ¶ 6. In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the non-moving party. *Pilz v. Ohio Dept. of Rehab. & Corr*, 2004-Ohio-4040, ¶ 8 (10th Dist.). "In order to defeat summary judgment, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings," citing Civ.R. 56(E), but rather, "must respond with evidence of the type listed in Civ.R. 56(C) that demonstrates a genuine issue of material fact exists for trial." *Taylor v. XRG, Inc.*, 2007-Ohio-3209, ¶ 21 (10th Dist.).

{¶ 13} Additionally, the question of discretionary immunity implicates a trial court's subject-matter jurisdiction, and subject-matter jurisdiction is a question of law for which we apply a de novo standard of review. *Smith v. Ohio State Univ.*, 2024-Ohio-764, ¶ 11; *Wilkes v. Ohio Dept. of Transp.*, 2025-Ohio-1030, ¶ 50 (10th Dist.).

### A. Discretionary Immunity

{¶ 14} In her first assignment of error, appellant argues the Court of Claims erred in granting summary judgment to appellee based on discretionary immunity because there

exist genuine issues of material fact. Specifically, appellant argues that the court improperly concluded that Coach Buchholz's decision to remove her from the soccer team was protected by discretionary immunity.

{¶ 15} "[D]iscretionary immunity is a jurisdictional bar, not an affirmative defense, and the Court of Claims does not have subject-matter jurisdiction over suits brought against the state when discretionary immunity applies." *Smith* at ¶ 21. The source of discretionary immunity is R.C. Chapter 2743 in which the state has waived its sovereign immunity for certain suits brought against it in the Court of Claims. *Id.* More specifically, the Supreme Court of Ohio held in *Reynolds v. State, Div. of Parole & Community Servs.*, 14 Ohio St.3d 68, 70 (1984), as follows:

> The language in R.C. 2743.02 that "the state" shall "have its liability determined . . . in accordance with the same rules of law applicable to suits between private parties . . ." means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.

{¶ 16} In granting summary judgment to appellee based on discretionary immunity, the Court of Claims concluded that "reasonable minds can conclude only that Coach Buchholz used his discretion as head coach to remove [appellant] from the team roster." (Jan. 31, 2025 Decision at 14.) The Court of Claims' reliance, however, on the fact that Coach Buchholz used discretion in his decision to dismiss appellant from the team warrants a closer look because, as discussed below, it is not the existence of a discretionary decision alone that triggers discretionary immunity. *See Foster v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-912, ¶ 23 (10th Dist.); *infra* ¶ 20. In order to find discretionary immunity, we must identify what policy might be at issue here.

{¶ 17} The Court of Claims concluded that appellee was entitled to discretionary immunity "for the decision to remove [appellant] from the team." (Jan. 31, 2025 Decision at 15.) But discretionary immunity applies to a state's "legislative or judicial functions or the exercise of an executive or planning function *involving the making of a basic policy decision* which is characterized by the exercise of a high degree of official judgment or discretion." (Emphasis added.) *Reynolds* at 70. Although it might not be difficult to conclude that a coach exercises a discretion when removing an athlete from his or her team

roster, we are not convinced that an individual coach's decision to remove an athlete from the team is a "function involving the making of a basic policy decision." Neither appellant nor the Court of Claims identified the particular policy the coach was making when exercising his discretion to remove appellant from the team.

{¶ 18} Notwithstanding, appellee cites cases in which courts have recognized immunity for a coach's discretionary decisions. *See Michael v. Worthington Ohio City School Dist.*, 2020-Ohio-1134 (10th Dist.); *Pope v. Trotwood-Madison City School Dist. Bd. of Edn.*, 2004-Ohio-1314 (2d Dist.); *Starkey v. Hartzler*, 1997 Ohio App. LEXIS 1177 (9th Dist. Mar. 26, 1997). The question of immunity in each of these cases was analyzed under R.C. 2744.03, part of R.C. Chapter 2744 which establishes tort immunity applicable to political subdivisions. The immunity described in R.C. 2744.03(A)(3) and (A)(5), which are the relevant subsections in the cases appellee cites, is stated differently than it is in R.C. 2743.02, relevant here. For example, R.C. 2744.03(A)(3) provides that a "political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was *within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee*." (Emphasis added.) And R.C. 2744.03(A)(5) provides immunity to a political subdivision "if the injury, death, or loss to person or property resulted from the *exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources* unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." (Emphasis added.)

{¶ 19} In contrast, R.C. 2743.02 states, in relevant part, that "[t]he state hereby waives its immunity from liability . . . and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between private parties[.]" *Reynolds* interpreted this language in R.C. 2743.02 to mean that "the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds*, 14 Ohio St.3d at 70. But we are not aware of any authority binding on this court which has extended the categories of political subdivision immunity for discretionary decisions described in R.C. 2744.03(A)(3) and (A)(5) to cases like this one to

which R.C. 2743.02 applies. Although *Reynolds* was decided prior to the enactment of R.C. Chapter 2744, we decline to extend the immunity described in *Reynolds* to the full scope of that described in R.C. 2744.03(A).

{¶ 20} Additionally, as noted in *Foster*, 2013-Ohio-912, at ¶ 23 (10th Dist.), discretionary immunity under R.C. 2743.02 requires more than just a discretionary decision by a state employee:

> Indeed, many state employees are called upon to exercise a high degree of discretion while working. Were we to find that discretionary immunity applies every time a state employee exercises discretion in performing his or her job, we would be vastly expanding the scope of the discretionary immunity doctrine while simultaneously limiting the scope of the state's waiver of sovereign immunity from liability as established by the Court of Claims Act. R.C. 2743.02(A)(1). Accordingly, application of the discretionary immunity doctrine requires more than a finding that a state employee . . . made a decision that required the exercise of a high degree of discretion—it requires a finding of the exercise of a high degree of official judgment or discretion as to an executive or planning function involving the making of a basic policy decision.

*See also Al-Jahmi v. Ohio Athletic Comm.*, 2022-Ohio-2296, ¶ 83-85 (10th Dist.) (applying *Reynolds* and *Foster* to conclude that the state athletic commission's decisions regarding referee and ringside physician training requirements and educational materials was protected by discretionary immunity, but the decisions to license and appoint a specific referee and physician were not because the agency failed to demonstrate the decisions concerned an executive or planning function involving the making of a basic policy decision); *Miller v. Ohio Dept. of Transp.*, 2014-Ohio-3738, ¶ 35 (10th Dist.) (concluding that the Ohio Department of Transportation's decision regarding whether "to fill a pothole" was not subject to discretionary immunity, as the decision did not involve the "complex evaluation" which would demonstrate "the exercise of an executive or planning function involving the making of a basic policy decision characterized by the exercise of a high degree of official judgment or discretion").

{¶ 21} Turning back, then, to the standard announced in *Reynolds*: even if we acknowledge that Coach Buchholz's decision to dismiss appellant from the team was a decision that involves discretion, discretionary immunity does not apply unless there was an exercise of a high degree of official judgment or discretion *as to an executive or planning*

*function involving the making of a basic policy decision.  See Reynolds*, 14 Ohio St.3d at 70.

{¶ 22} Under the particular facts of this case, we find that the basis of liability in appellant's claims involves the circumstances specific to appellant's dismissal and that the particular circumstances of appellant's dismissal do not involve the making of a basic policy decision.  Although the coach, when dismissing appellant from the team, may have exercised the discretion required in performing the job, we do not find that a discretionary decision alone renders the action subject to discretionary immunity in R.C. 2743.02 as described in *Reynolds*.  Therefore, on the facts of this case, we find discretionary immunity does not apply.

{¶ 23} In her opposition to appellee's summary judgment motion, appellant asserted that she was not arguing against UT's decision to remove her from the team, but instead, the manner in which it did. Because her removal was retaliatory in nature and punitive, she argued, it was outside the scope of discretionary immunity.  In making this argument, appellant appears to assume there was a policy that was being implemented by Coach Buchholz when he removed her from the team.  Moreover, appellee appears to recognize that appellant's claims for liability do not challenge the existence of a policy that allows a coach discretion to determine his or her roster and instead challenge how Coach Buchholz made that determination in her circumstance.  Appellee pointed out in its brief that, "[h]ere, the coach decided to dismiss Mohler from the team unless she apologized. Mohler refused and she was dismissed." (Appellee's Brief at 14.)  Appellee further noted that "Mohler points to no laws, rules, policies or procedures that UT breached to implement her dismissal," and "[t]here were simply no procedural requirements in place that prohibited the coach from sending an email to Mohler to dismiss her." (Appellee's Brief at 14, 15.)  The Court of Claims did not accept appellant's argument that she was arguing against the manner in which she was removed from the team.

{¶ 24} In some cases, this distinction between exercising a high degree of official judgment or discretion to make a policy versus implementing a policy is significant because, as noted above, the Supreme Court and this court have held that the state's sovereign immunity does not apply when the state "acts pursuant to" a policy nor does it extend to the state's "acts of implementation" of a policy because the state has a duty to properly implement its policy decisions. *See Risner v. Ohio Dept. of Transp.*, 2015-Ohio-4443, ¶ 24.

In *Reynolds*, the Supreme Court distinguished the exercise of making a basic policy decision pursuant to an executive or planning function from the performance of an activity or function pursuant to that policy. "[O]nce the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the *performance* of such activities." (Emphasis added.) *Reynolds,* 14 Ohio St.3d at 70. Consistent with this, the Supreme Court recently emphasized that "[t]he state has not waived its sovereign immunity when it *acts pursuant* to its highly discretionary legislative, judicial, executive, or planning functions." (Emphasis added.) *Smith*, 2024-Ohio-764, at ¶ 21. Stated another way, "[d]iscretionary immunity does not 'extend beyond [the state's] discretionary function to acts of *implementation*.' " (Emphasis added.) *Smith v. Ohio State Univ.*, 2024-Ohio-5887, ¶ 24 (10th Dist.), quoting *Risner* at ¶ 24.

{¶ 25} This is not a case where such a distinction matters. It is not necessary for us to address appellant's arguments that the manner in which Coach Buchholz terminated appellant from the team fall outside the scope of discretionary immunity because the evidence did not establish that Coach Buchholz's exercise of discretion involved the making of a policy and, therefore, discretionary immunity does not apply in the first place.[1]

---

[1] Furthermore, the evidence did not establish that in terminating appellant from the team, Coach Buchholz was implementing a policy created pursuant to its executive or planning functions which involved the exercise of a high degree of official judgment or discretion. In an affidavit that appellee submitted with its motion for summary judgment, Kenneth Schank, Associate Athletic Director for Compliance for appellee at the time, averred as follows: "The head women's soccer coach at the time, TJ Buchholz, had the authority to determine who was on the soccer team and to dismiss her from the team." (Schank Aff. at ¶ 10.) In a deposition, Schank testified as follows:

> Q: . . . is it UT's policy that a coach can add and delete a player in their discretion?
>
> A: Correct. The coach has the autonomy to make that decision.
>
> . . .
>
> Q: Your affidavit says that they have the authority to determine who can be dismissed? Is that for any reason?
>
> A: Correct. A coach can add and remove as they deem necessary.
>
> Q: Is that in accordance with NCAA policy as well?
>
> A: Correct. I mean, from a roster spot, there's not an NCAA rule that specifically addresses, you know, why or -- I'm sorry -- any type of

{¶ 26} For the reasons articulated above, we find that appellant's claims fall outside the scope of discretionary immunity, and we therefore conclude that the Court of Claims has jurisdiction to determine appellant's claims.  Accordingly, for reasons other than those set forth by the Court of Claims, we sustain appellant's first assignment of error.

{¶ 27} Our conclusion that discretionary immunity does not apply in this case is not to say that appellee is *liable* for the claims appellant has asserted.  It simply means that the Court of Claims has jurisdiction over the claims. Accordingly, we address appellant's remaining assignments of error.[2]

### B. Negligent Misrepresentation

{¶ 28} In her second assignment of error, appellant argues that the Court of Claims erred in granting summary judgment to appellee on her negligent misrepresentation claim as a result of its failure to construe the facts in a light most favorable to her.  Specifically, appellant argues that the court ignored facts indicating that a reasonable person in appellant's position would have believed he or she had signed an official NLI despite the language of the document.

{¶ 29} In response, appellee argues that appellant's rights to appeal her dismissal from the soccer team were not based on the letter.  It noted that the Student Athlete Handbook provided a student under a scholarship an opportunity to appeal terminated or reduced financial aid, which appellant was not receiving at the time of her dismissal from the team.  Appellee also notes that it provided evidence that appellant's ability to enter the transfer portal after her dismissal was not based on the nature of the letter that appellant signed.

---

procedural matter of which a student-athlete is dismissed from the team.  I mean, the coach has the authority to dismiss them as they see fit.

(Schank Dep. at 109-11.) Aside from this testimony, appellee has provided no evidence of the policy described by Schank. Appellee also did not provide evidence how the making of any such policy involved the exercise of a high degree of official judgment or discretion. Furthermore, appellee concedes in its brief that "there were no NCAA or UT policies that set forth the procedures to remove a player from the roster." (Appellee's Brief at 14-15.) Finally, as noted above, neither appellant nor the court identified any such policy.

[2] In the decision below, the Court of Claims addressed the merits of appellant's claims within the scope of appellee's summary judgment motion despite having concluded that discretionary immunity applied. Therefore, we need not remand the case and can proceed with a review of the court's decision as it relates to the remaining assignments of error.

{¶ 30} The four elements of negligent misrepresentation are as follows: "1) one who, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest, 2) supplies false information for the guidance of others in their business transactions, 3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, 4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information." *Federated Mgt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 395 (10th Dist. 2000), citing *Delman v. Cleveland Hts.*, 41 Ohio St.3d 1, 4 (1989).

{¶ 31} Appellant's complaint states that she relied on two allegedly false statements to her detriment; one, the document she signed to agree to play for UT that UT later described as a non-binding, ceremonial letter rather than an NLI, and two, statements from UT's doctor that she could not play without undergoing surgery along with a statement by the coach that her scholarship was intact as long as there was a viable road for recovery from the surgery.

{¶ 32} The Court of Claims concluded that, construing the evidence in favor of appellant, appellant failed to demonstrate that appellee supplied her false information by providing a document that was not an NLI because the document itself did not bear the markings or other indicators of it being an NLI. The court further concluded that appellant could not demonstrate justifiable reliance on Coach Buchholz's statement that she could retain her scholarship if she had a viable path to recovery after her knee surgery as a basis to believe she would not be dismissed for any reason.

{¶ 33} We agree with the Court of Claims that appellee is entitled to summary judgment on appellant's negligent misrepresentation claim. Appellant did not present any evidence to rebut Associate Athletic Director of Compliance Kenneth Schank's affidavit and deposition testimony explaining that the document appellant signed was a ceremonial letter of commitment. Additionally, the document itself did not bear the identifiers of a binding NLI from the NCAA. Instead, it bore a UT watermark and stated that it was a "qualified letter of commitment." (Jan. 31, 2025 Decision at 17.) Appellant's arguments appear to rely on the absence of information from UT that the letter she signed was ceremonial in nature. But appellant points to no affirmative evidence that UT falsely represented the letter was an official NLI.

{¶ 34} Appellant also did not present evidence to rebut Schank's affidavit statements that appellant was not on an athletic scholarship in the spring semester of 2022. Thus, there is no evidence to support a claim that appellant's reliance on what she signed, prior to the beginning of her scholarship period, was justifiable.

{¶ 35} With respect to her knee surgery, appellant acknowledged that she "was required by the NCAA to undergo the pre-participation physical examination" before she could participate in any athletic activities. (Compl. at ¶ 46.) Appellant has pointed to no information indicating that the UT doctor or the coaching staff made a false representation about the nature of her pre-participation medical examination or the diagnosis of her knee. Additionally, appellant has pointed to no evidence indicating that Coach Buchholz's statement that her scholarship would remain intact so long as she had a viable path to recovery following surgery was false at the time it was made. Appellant acknowledged that it was, ultimately, her unwillingness to do what the coaching staff had asked her to do that resulted in her dismissal from the team, not an inability to recover from knee surgery. Moreover, appellant has not alleged that she believed or that Coach Buchholz represented that the *only way* she could be dismissed from the team was for lack of a viable path to recovery after the surgery. Thus, appellant has not presented facts supporting that she justifiably relied on appellee's statements with respect to her knee surgery.

{¶ 36} Accordingly, we overrule appellant's second assignment of error.

### C. Promissory Estoppel

{¶ 37} In her third assignment of error, appellant argues that the Court of Claims erred in granting summary judgment to appellee on appellant's promissory estoppel claim based on a finding of fact that her relationship with UT was contractual in nature and that she did not reasonably rely on UT's alleged promises.

{¶ 38} "The elements necessary to establish a claim for promissory estoppel are a (1) promise, (2) clear and unambiguous in its terms, (3) reliance that is reasonable and foreseeable, and (4) injury caused by such reliance." *Patel v. Univ. of Toledo*, 2017-Ohio-7132, ¶ 21 (10th Dist.).

{¶ 39} Appellant alleged in her complaint that, in agreeing to have surgery, she relied on Coach Buchholz's "promise" that her scholarship would remain intact after the procedure. (Compl. at ¶ 56.) Appellant also alleged she would have sought other medical opinions for treatment if she had not been promised her scholarship would be unaffected,

and, because she was not able to use UT's resources for physical therapy and recovery following her dismissal, she therefore incurred costs. (Compl. at ¶ 58-59.)

{¶ 40} The Court of Claims concluded that appellant's relationship with appellee with respect to payment of medical bills relating to pre-existing injuries was contractual in nature based on the Student Athlete Handbook and, even if it was not, appellant could not establish that she reasonably relied on the coach's statements about her knee recovery.

{¶ 41} We agree with the Court of Claims that appellee is entitled to summary judgment on appellant's promissory estoppel claim. As described above, appellant acknowledged in her complaint that she "was required by the NCAA to undergo the pre-participation physical examination" before she could participate in any athletic activities. (Compl. at ¶ 46.) Additionally, she stated she was informed "there was no possibility of playing for UT without undergoing surgery." (Compl. at ¶ 20.) Thus, appellant's claims that she relied on the coach's "promise" about her scholarship following surgery contradict her acknowledgment that surgery was necessary for her eligibility to play.

{¶ 42} Additionally, as noted above, appellant has not alleged that she believed, or that Coach Buchholz represented that, the *only way* she could be dismissed from the team was for lack of a viable path to recovery after the surgery. Appellant was ultimately dismissed from the team, in her words, "[b]ecause of her refusal to lie," not an inability to recover from knee surgery. (Compl. at ¶ 32.) Thus, even if we construed Coach Buchholz's statement about appellant's scholarship following surgery as an actionable "promise," appellant has presented no evidence to demonstrate that she reasonably or foreseeably relied on that statement to agree to the surgery, a necessary element to support a promissory estoppel claim.

{¶ 43} Accordingly, we overrule appellant's third assignment of error.

**D. Negligence**

{¶ 44} In her fourth assignment of error, appellant argues that the Court of Claims erred in granting summary judgment to appellee on appellant's negligence claim based on an erroneous conclusion that no common-law duty of care is owed to student athletes to prevent hostile or abusive conduct by athletic coaching staff.

{¶ 45} In general, negligence requires proof of "(1) a duty requiring the defendant to conform to a certain standard of conduct, (2) breach of that duty, (3) a causal connection between the breach and injury, and (4) damages." *Cromer v. Children's Hosp. Med. Ctr. of*

*Akron*, 2015-Ohio-229, ¶ 23, citing *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984). *See also Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981), citing *Feldman v. Howard*, 10 Ohio St.2d 189, 193 (1967).

{¶ 46} Appellant alleged in her complaint that the UT coaching staff "had the duty to provide [appellant] a safe team environment free from abuse, harassment, ridicule, embarrassment, and hostility." (Compl. at ¶ 62.) She further alleged that appellee breached this duty when Coach Cunningham verbally abused her, and that Coach Buchholz created an unsafe environment by not stopping Coach Cunningham's behavior or responding to the alleged abuse.

{¶ 47} In her brief, appellant argues that *Cameron v. Univ. of Toledo*, 2018-Ohio-979 (10th Dist.), recognizes a general duty of care "for coaches to supervise athletes in a safe and supportive environment, which necessarily includes preventing hostile or abusive behavior" like what she allegedly experienced.[3] (Appellant's Brief at 28.) Appellant further argues that the Court of Claims incorrectly distinguished and limited *Cameron*. In response, appellee argues that appellant's allegations fall short of establishing that appellee had an actionable duty to not offend or upset a player.

{¶ 48} In *Cameron*, this court held that two of UT's football team coaching staff owed a duty of care to a player who was injured during an event after practice at which upperclassmen players instructed freshman offensive line players to complete a series of activities. *Cameron* at ¶ 58. Cameron, a freshman offensive lineman, fell during an attempt to dunk a football over the goalpost crossbar and suffered a brain injury that prevented him from playing football and resulted in the loss of his athletic scholarship. *Id.* at ¶ 4-5. This court explained that it made the determination "[u]nder the particular circumstances of this case," that a duty existed based on "(1) [the coaching staff persons'] contractual duties to protect and keep safe student athletes, (2) a common-law duty between a coach and student athletes under same or similar circumstances, *and* (3) the foreseeability of the harm suffered by Cameron." (Emphasis added.) *Id.* at ¶ 58.

{¶ 49} Here, the Court of Claims concluded that the facts in *Cameron* were distinguishable from the facts in this case. It also found that appellant "pointed to no facts"

---

[3] In her brief, appellant incorrectly refers to this case as "*Cameron v. Ohio State University*, 2019-Ohio-5048." (Appellant's Brief at 27.) Based on the context, however, we understand appellant to be referring to the case cited in the Court of Claims' decision, *Cameron v. Univ. of Toledo*, 2018-Ohio-979 (10th Dist.).

that would allow a finding of a duty of care such as that found in *Cameron*. (Jan. 31, 2025 Decision at 26.) It further noted that appellant cited no authority, and the court itself found no authority, that would support the proposition that "a common-law duty of care is owed to student-athletes to prevent hostile or abusive comments made by athletic staff." (Jan. 31, 2025 Decision at 26.) We agree with the Court of Claims that the duty of care finding in *Cameron* was based on the particular facts of that case.

{¶ 50} Furthermore, the court in *Cameron* specifically held that the determination that UT owed Cameron a duty of care was based on the specific contractual duties[4] of the coaches, the foreseeability of harm[5] suffered by Cameron and "a common-law duty between a coach and student athletes under same or similar circumstances." *Cameron*, 2018-Ohio-979, at ¶ 58 (10th Dist.). In this case, appellant challenges only the Court of Claims' finding that no common-law duty existed.

{¶ 51} Regarding the common-law duty, the *Cameron* court also noted that it found only one Ohio case that acknowledged a common-law duty of care for coaches to their players. *Cameron* at ¶ 56. In that case, *Limerick v. Euclid Bd. of Edn.*, 69 Ohio App.3d 807 (8th Dist. 1990), a high school student was injured while trying out for the varsity football

---

[4] Regarding contractual duties, the Court of Claims held that the relationship between appellant and UT may reasonably be construed as being contractual in nature based on the Student Athlete Handbook. The court ultimately determined that "insofar as such policies exist, the alleged policies would be governed by the Handbook and would be based on contract law, not a claim raised here." (Jan. 31, 2025 Decision at 24.) As noted above, appellant did not challenge this conclusion on appeal.

[5] Regarding foreseeability, the Court of Claims did not address the issue. In her complaint, appellant did not allege that the harm she suffered was foreseeable. However, in her memorandum contra the motion for summary judgment, in support of foreseeability, appellant stated:

> The circumstances of this case include plaintiff testifying that she reached out to various UT personnel regarding the issues she was experiencing from UT's soccer coaches. Caitlin Mohler Depo. 132-136. Caitlin testified that she was intimidated by the coaches, was subjected to ridicule and embarrassment, and was excluded from team activities. Such testimony supports a finding of foreseeability of mental harm for purposes of the existence of a duty.

(Dec. 2, 2024 Pl.'s Memo Contra to Def.'s Mot. for Summ. Jgmt. at 9-10.) Appellant testified in her deposition that she talked to several persons associated with the university "about the issues [she was] experiencing." (Mohler Dep. at 132-36.) Appellant does not elaborate how this is evidence that the harm she suffered from Coach Cunningham's words was foreseeable. Nevertheless, it is not necessary for us to consider the same because the issue raised and argument in appellant's brief only addresses the Court of Claims' conclusion that there is no common-law duty applicable here. Appellant does not argue that if this court were to affirm the Court of Claims' conclusion regarding common-law duty we should still remand for the Court of Claims to consider whether a duty exists pursuant to foreseeability.

team. At the time, he did not have medical insurance. *Id.* at 809. The student and his mother sued the school, arguing negligent supervision based on an alleged legal duty of the school to prohibit participation in practices or games until the player obtained a medical insurance coverage form from a parent. *Id.* The court found no such duty and explained as follows:

> The appellants cite no legal precedent imposing a duty on a school to obtain proof that an athlete has medical insurance. While there *may be* a general duty to supervise an athlete by giving adequate instruction, supplying proper equipment and supervising the particular contest, that duty cannot be extended to require proof of medical insurance.

(Emphasis added.) *Id.* at 810.

{¶ 52} From this source, the court in *Cameron* found, "Given the circumstances here, as outlined in this discussion of duty, this court finds that [the coaching staff] had a common-law duty of care to Cameron consistent with due care a coach under same or similar circumstances would have." *Cameron* at ¶ 56. Nothing in *Cameron* or *Limerick* suggests that a duty of care that a coach may have to supervise an athlete extends to the circumstances present in this case or the duty of care as described by appellant.

{¶ 53} Additionally, the court in *Cameron* noted that "[m]*ore significant* in this case than any common-law duty is the presence of foreseeability." (Emphasis added.) *Id.* at ¶ 57. Because the coaching staff had testified the goal-post dunk was a dangerous activity, the court was able to find there was a foreseeability of harm for purposes of the existence of a duty. *Id.* " '[I]f a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied.' " *Id.* at ¶ 51, quoting *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshal,* 2002-Ohio-4210, ¶ 23.[6] Yet, appellant did not raise the issue of foreseeability on appeal. Although the question of whether a duty exists for purposes of negligence is a question of law that we review de novo, we are limited by the arguments the parties present. *See Cleveland v. 8009 Lake L.L.C.*, 2025-Ohio-2775, ¶ 8 (8th Dist.), citing *Snyder v. Old World Classics, L.L.C.*, 2025-Ohio-1875, ¶ 4.

---

[6] *See supra* footnote 5.

{¶ 54} Because we find that the Court of Claims did not err in concluding that appellant failed to establish the existence of a common-law duty of care as asserted in the circumstances of this case, we affirm the Court of Claims' decision on that basis.[7]

{¶ 55} Accordingly, we overrule appellant's fourth assignment of error.[8]

## IV. Conclusion

{¶ 56} For the foregoing reasons, we conclude that summary judgment was proper in this case. Although we sustain appellant's first assignment of error based on our conclusion that discretionary immunity did not apply to appellant's claims, we conclude that appellee was nevertheless entitled to judgment as a matter of law on those claims. Therefore, we overrule appellant's second, third, and fourth assignments of error and affirm the decision of the Court of Claims of Ohio.

*Judgment affirmed.*

JAMISON, P.J., and MENTEL, J., concur.

————————

[7] Notwithstanding the task of undertaking a de novo review, "appellate courts do not conduct an independent review of all potential issues implicated by the dispute." *Cleveland*, 2025-Ohio-2775, at ¶ 8 (8th Dist.).

[8] Before concluding, we note that appellant has argued that the Court of Claims' decision to not find a common-law duty of care to prevent hostile or abusive conduct by athletic staff sets a dangerous precedent and "effectively paves the way for coaches to create hostile and abusive environments for student-athletes without any recourse." (Appellant's Brief at 28-29.) We reject that contention and the particularly serious accusation that it contains. Our decision is limited to the facts of this case and the arguments raised in this case. Furthermore, for the sake of thoroughness, even without the existence of a common-law duty, we note that a coach who commits misconduct may be subject to any number of consequences and sanctions for his or her actions, including professional discipline, licensing or credentialing penalties, and even criminal or other civil sanctions or claims. And other recourse may exist for student-athletes outside of a negligence action, including claims under Title IX (20 U.S.C. 1681, 1681-89), the U.S. SafeSport Code (36 U.S.C. 220541-220542), or other state and federal laws. There is no basis on which to read the court's decision as a green light for coach misconduct.